[No. C040322. Third Dist. Sept. 23, 2002.*]

In re NORMAN G. MORRALL on Habeas Corpus.

---

*Review granted November 26, 2002. On February 11, 2003, review dismissed and cause remanded to Court of Appeal, Third Appellate District, and opinion directed to be published by the Supreme. Court. Brown, J., did not participate therein. Kennard, J., Werdegar, J., and Chin, J., are of the opinion the matter should be dismissed but that the Court of Appeal opinion should remain unpublished.

**COUNSEL**

Latham & Watkins, Stephan E. Klein and Kyra G. Busby, for Petitioner Norman G. Morrall.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, Susan Duncan Lee and Allen R. Crown, Deputy Attorneys General, for Respondent the People.

**OPINION**

**SCOTLAND, P. J.**—Pursuant to the authority conferred upon him by article V, section 8, subdivision (b) of our state Constitution, and by Penal Code section 3041.2, Governor Davis reversed a decision of the Board of Prison Terms finding that petitioner Norman G. Morrall is suitable for parole. After unsuccessfully seeking relief in the superior court, Morrall filed a petition for a writ of habeas corpus in this court. We issued an order to show cause to consider his challenges to the Governor's action.

Morrall contends (1) the Governor has unilaterally dismantled the parole system by adopting, contrary to law, a policy against the parole of persons convicted of murder, (2) the Governor's decision is not supported by any evidence, and (3) the decision violates principles of due process and the prohibition against the ex post facto application of penal laws.

In response, the Attorney General asserts that the final decision whether a convicted murderer should be released on parole is committed exclusively to

the Governor, and the constitutional separation of powers doctrine precludes judicial review of the merits of the Governor's decision.

For reasons to follow, we conclude that a blanket policy of the denial of parole for convicted murderers would be unlawful and that such persons are entitled to individual consideration. But political rhetoric does not establish such a blanket policy. In the absence of specific evidence of a refusal to perform a legal duty, we rely, as we must, on the Governor's fidelity in the performance of the duties of his office. The Governor's decisions with respect to parole are subject to judicial review on the merits, but the scope of this review is narrow. A court may not interfere with the Governor's exercise of discretion. Thus, to establish cause for relief, a prospective parolee must demonstrate that there is no basis in fact for the decision, i.e., it is not supported by any evidence. On the facts of this case, we cannot find that the Governor's action had no basis in fact. The Governor's review of the Board of Prison Terms' determination did not violate principles of due process and did not violate the prohibition against ex post facto laws. Accordingly, we shall deny the petition for a writ of habeas corpus.

## FACTUAL AND PROCEDURAL BACKGROUND

Morrall and the woman he later murdered were married and had two children. After almost 20 years of marriage, an action to dissolve the union was commenced in 1979. The proceedings were apparently acrimonious and, in 1981, Morrall killed his estranged wife.

The victim was killed in the doorway of her home. Morrall says he went there intending to ask for an extension of visitation with his son. He took with him a loaded firearm and claims that he intended to wave the gun in the victim's face to make her stop talking or shouting at him. When the conversation became heated, Morrall shot the victim seven times, wounding her in the neck, chest, head, thoracic area, and right hand. The neck wound was inflicted from very close range and reportedly was a contact wound.

Although it was too late to save her life, Morrall drove the victim to the hospital and admitted that he shot her. He was convicted of second degree murder and sentenced to state prison for 15 years to life, with a two-year enhancement for using a firearm. He was received by the Department of Corrections on July 21, 1983.

In 1993, a panel of the Board of Prison Terms (the Board) found that Morrall was suitable for parole. Following various further proceedings, that decision was rescinded by the Board. Following hearings in 1997 and in 1998, Morrall was found unsuitable for parole.

In 1999, a panel of the Board again found that Morrall was suitable for parole. That determination was referred to the Board's decision review unit,

which upheld the decision with the imposition of a special condition that Morrall would be required to attend anger control and/or stress management programs upon his release from prison. However, on September 21, 1999, Governor Davis reversed the Board's decision.

In 2001, a panel of the Board found that Morrall was suitable for parole. On September 5, 2001, Governor Davis reversed that decision.

After the Governor's decision in 1999 to reverse the Board's determination that Morrall was suitable for parole, Morrall sought relief by petition for writ of habeas corpus in the Sacramento County Superior Court, which denied the petition as untimely. On Morrall's petition for a writ of habeas corpus in this court, we issued an order to show cause returnable before the Sacramento County Superior Court. After the Governor's second reversal in September 2001 of the Board's determination that Morrall was suitable for parole, the superior court heard and denied Morrall's petition on the merits. Morrall then commenced this proceeding in habeas corpus.[1]

DISCUSSION

I

To address Morrall's challenges to the Governor's action, we must begin with an overview of California's parole system.

A

■ "The word 'parole' was originally a military term signifying the word of honor or promise of a prisoner of war that if he be released, he will comply with certain conditions, such as to refrain from bearing arms against his captors. As used in penology, the term has come to signify the release of a prisoner prior to expiration of his term of imprisonment conditioned upon his continuing good behavior during the remainder of the term." (*In re Peterson* (1939) 14 Cal.2d 82, 85 [92 P.2d 890].) A prisoner released on parole is not discharged; he is merely permitted to serve the remainder of his term outside rather than within prison walls. (*People v. Denne* (1956) 141 Cal.App.2d 499, 508 [297 P.2d 451].) Until discharged from parole, he remains under the custody of the Department of Corrections and is subject to being taken back within the enclosure of the prison. (Pen. Code, §§ 3000, 3056.)

A person convicted of crime has no inherent or constitutional right to conditional release before the expiration of a valid sentence. (*Greenholtz v.*

---

[1]In his petition, Morrall devotes considerable discussion to establish that he has sought relief in a timely manner. In issuing an order to show cause, we made a preliminary determination that Morrall has proceeded in a timely manner. (*In re Serrano* (1995) 10 Cal.4th 447, 455 [41 Cal.Rptr.2d 695, 895 P.2d 936].) In their return, the People do not challenge the petition on the ground of untimeliness or on any other procedural basis.

*Nebraska Penal Inmates* (1979) 442 U.S. 1, 7 [99 S.Ct. 2100, 2103-2104, 60 L.Ed.2d 668, 675].) Therefore, in establishing a parole system, a state may be as specific or general in defining the conditions for release and the factors to be considered as it believes will serve the public interest. (*Id.* at p. 8 [99 S.Ct. at p. 2104, 60 L.Ed.2d at pp. 675-676].)

"It is thus not surprising that there is no prescribed or defined combination of facts which, if shown, would mandate release on parole. . . . In each case, the decision differs from the traditional mold of judicial decisionmaking in that the choice involves a synthesis of record facts and personal observation filtered through the experience of the decisionmaker and leading to a predictive judgment as to what is best both for the individual inmate and for the community. This latter conclusion requires the Board to assess whether, in light of the nature of the crime, the inmate's release will minimize the gravity of the offense, weaken the deterrent impact on others, and undermine respect for the administration of justice. The entire inquiry is, in a sense, an 'equity' type judgment that cannot always be articulated in traditional findings." (*Greenholtz v. Nebraska Penal Inmates, supra,* 442 U.S. at p. 8 [99 S.Ct. at p. 2104, 60 L.Ed.2d at p. 676], fn. omitted; accord, *In re Schoengarth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200].)

"While a prisoner eligible for parole has the right to apply therefor and to have his application duly considered, he has no right to a parole at any fixed time, or at all . . . ." (*In re Schoengarth, supra,* 66 Cal.2d at p. 300.) In considering whether parole should be granted, the parole authority is not guided solely by the prisoner's good conduct while he was incarcerated, but must consider a wide variety of factors, including the nature of his offense, his age, his prior associations, his habits, inclinations and traits of character, the probability of his reformation, and the interests of public security. (*Ibid.*) In this respect, the discretion of the parole authority has been described as "great" and "almost unlimited." (*In re Powell* (1988) 45 Cal.3d 894, 902 [248 Cal.Rptr. 431, 755 P.2d 881].)

By its nature, the determination whether a prisoner should be released on parole is generally regarded as an executive branch decision. (*Greenholtz v. Nebraska Penal Inmates, supra,* 442 U.S. at p. 7 [99 S.Ct. at pp. 2103-2104, 60 L.Ed.2d at p. 675]; accord, *In re Lee* (1918) 177 Cal. 690, 693-695 [171 P. 958].) The decision, and the discretion implicit in it, are expressly committed to the executive branch. (Pen. Code, § 3040 et seq.; Cal. Const., art. V, § 8.) It is not a judicial decision. (*Greenholtz v. Nebraska Penal Inmates, supra,* 442 U.S. at p. 7 [99 S.Ct. at pp. 2103-2104, 60 L.Ed.2d at p. 675]; *In re Minnis* (1972) 7 Cal.3d 639, 650 [102 Cal.Rptr. 749, 498 P.2d 997]; *In re Fain* (1976) 65 Cal.App.3d 376, 389 [135 Cal.Rptr. 543]; *Fleischer v. Adult Authority* (1962) 202 Cal.App.2d 44, 47-48 [20 Cal.Rptr. 603].)

## B ·

Prior to 1977, California, like many other states, had an indeterminate sentencing law. (See *Way v. Superior Court* (1977) 74 Cal.App.3d 165, 168-169 [141 Cal.Rptr. 383].) A sentencing court would not select a fixed term, but would impose an indeterminate term, generally expressed as a range such as five years to life. (*People v. Morse* (1964) 60 Cal.2d 631, 642 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) The legal effect of the imposition of an indeterminate term was a sentence for the maximum term. (*In re Lee, supra,* 177 Cal. at p. 693.) It would be left to the executive branch to determine the actual period of confinement by, among other things, exercise of the authority to grant parole within the minimum and maximum time specified for the commitment offense. (*People v. Morse, supra,* 60 Cal.2d at p. 642.)[2]

It was generally recognized that indeterminate sentencing laws were intended "to mitigate the punishment which would otherwise be imposed upon the offender. These laws place emphasis upon the reformation of the offender. They seek to make the punishment fit the criminal rather than the crime." (*In re Lee, supra,* 177 Cal. at p. 692.) Accordingly, the executive authority would not fix the actual period of imprisonment pursuant to a formula of punishment, but would do so in accordance with the adjustment and social rehabilitation of the individual. (*People v. Morse, supra,* 60 Cal.2d at pp. 642-643.)

Effective July 1, 1977, California ended its indeterminate sentencing scheme by enacting the Uniform Determinate Sentencing Act of 1976. (*Way v. Superior Court, supra,* 74 Cal.App.3d at pp. 168-169.) In making this comprehensive revision of our penal laws (*id.* at pp. 170-171), the Legislature declared that the purpose of imprisonment for crime is punishment and that, for most offenses, this purpose can best be served by providing for uniform fixed-term sentences. (Pen. Code, § 1170, subd. (a)(1).)[3]

However, the Legislature excluded certain crimes, such as the second degree murder in this case, from the determinate sentencing scheme applicable to other offenses. (See *In re Monigold* (1983) 139 Cal.App.3d 485, 490

---

[2]Under the indeterminate sentencing law, the executive authority had two responsibilities. First, it would set a fixed term, which could be described as the primary term, at some point between the minimum and maximum term imposed by the court. Second, it had the power to release the inmate on parole before the expiration of the primary term. (See *In re Rodriguez* (1975) 14 Cal.3d 639, 652-653 [122 Cal.Rptr. 552, 537 P.2d 384].) Unless and until the authority set the primary term at less than the maximum, the inmate's sentence was regarded as the maximum. (*Ibid.*)

[3]For persons sentenced to determinate terms, the Legislature has retained the concept of parole. But, in those instances, release on parole is not discretionary; rather, it is mandatory when the inmate has served the fixed term of confinement less applicable credits and is willing to accept the conditions of parole. (Pen. Code, § 3000 et seq.)

[188 Cal.Rptr. 698].) Nevertheless, punishment remains the major purpose of imprisonment for such offenses. For example, the provision under which Morrall was sentenced provides that a person guilty of second degree murder "shall be punished" in the state prison for a term of 15 years to life. (Pen. Code, § 190, subd. (a).) With respect to the offenders who are sentenced to indeterminate terms, the Legislature determined that the public interest can best be served by having their ultimate release dates determined through the exercise of executive discretion pursuant to the policies and procedures applicable to parole.

### C

Penal Code section 3040 gives the Board the power to allow prisoners sentenced to indeterminate terms to go on parole outside the prison walls and enclosures. The Legislature has specified that one year prior to the inmate's minimum eligible release date, a panel of at least two commissioners of the Board shall meet with the inmate and shall normally set a parole release date. (Pen. Code, § 3041, subd. (a).) However, the panel or the Board need not set a release date if "it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen. Code, § 3041, subd. (b).)

The procedures to be followed by the Board are set forth in Penal Code section 3041.5. Prior to a hearing to determine parole suitability, a prisoner has the right to review the file to be examined by the Board and to enter a written response to any material in the file. (Pen. Code, § 3041.5, subd. (a)(1).) The prisoner has the right to be present, to ask and answer questions, and to speak on his own behalf. (Pen. Code, § 3041.5, subd. (a)(2).) The prisoner must be permitted to request and receive a stenographic record of all proceedings. (Pen. Code, § 3041.5, subd. (a)(4).) If a parole date is not set, then within 20 days, the Board must provide a written statement setting forth the reason or reasons and suggesting activities in which the inmate might participate that will benefit him while incarcerated. (Pen. Code § 3041.5, subd. (b)(2).)

The Board is authorized to establish and enforce rules and regulations pursuant to which prisoners may be permitted to be on parole. (Pen. Code,

§ 3052.) For prisoners who, like Morrall, were convicted of murder committed on or after November 8, 1978,[4] parole is governed by sections 2400 to 2407 of title 15 of the California Code of Regulations. The regulations reflect the statutory requirement that the parole determination be a two-step process. First, the Board must determine whether the prisoner is suitable for parole. If the prisoner is found suitable for parole, a parole release date must be set. (Cal. Code Regs., tit. 15, § 2401.) With respect to these determinations, the regulations provide general guidelines only. (Cal. Code Regs., tit. 15, §§ 2401, 2402, subds. (c), (d).) The determination is to be made on consideration of each case on an individual basis. (*Ibid.*)

In this case, we are concerned solely with the suitability-for-parole determination. The regulations state: "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a).) "All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

In 1984, the Legislature enacted Penal Code section 3041.1, which gives the Governor the authority, up to 90 days before any scheduled release date, to request review of any decision concerning the grant or denial of parole to any prisoner in a state prison. In making such a request, the Governor is required to state his or her reasons, and whether the request is based on a public safety concern, a concern that the gravity of the current or past convicted offenses may have been given inadequate consideration, or on other factors. Upon such a request, the full Board is required to review the parole decision, and a vote of a majority of the Board is required to grant parole.

In 1988, the Legislature proposed and the electorate approved the addition of section 8, subdivision (b), to article V of the state Constitution, stating:

---

[4]At the General Election on November 7, 1978, the electorate approved an initiative measure that enhanced the minimum term for first degree murder and made second degree murder an offense subject to indeterminate sentencing.

"No decision of the parole authority of this State with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."

Penal Code section 3041.2 implements the constitutional provision. It provides that, when reviewing a parole decision, the Governor shall review the materials provided by the parole authority. It further requires that, if the Governor reverses or modifies a parole decision, he or she must send a written statement to the inmate specifying the reasons for the decision.

Although the Governor has the authority to independently review and reverse, modify, or affirm decisions of the Board, the Governor's function is one of review. (*In re Arafiles* (1992) 6 Cal.App.4th 1467, 1477-1478, 1484 [8 Cal.Rptr.2d 492].) This means the Governor's consideration is limited to the record before the Board, and the Governor must base his or her decision on the same factors the Board was required to consider. (*Ibid.*)

## II

Morrall contends Governor Davis has unilaterally dismantled the parole system through a blanket policy of denying parole to persons convicted of murder and that, in view of his no-parole policy, allowing the Governor to review parole decisions violates principles of due process.

### A

It is without doubt that a blanket no-parole policy would be contrary to the law, which contemplates that persons convicted of murder without special circumstances may eventually become suitable for parole and that, when eligible, they should be considered on an individualized basis. (Pen. Code, §§ 3041, 3041.5.) As this court already has noted in *In re Arafiles, supra,* 6 Cal.App.4th 1467, the Governor's authority is one of review, and he must consider the same materials and base his decision on the same factors that the Board is required to consider. (*Id.* at pp. 1477-1478, 1484.) Implicit therein is a requirement that the Governor must apply the same legal standards that the Board must apply, including individualized consideration of an inmate's suitability for parole.

Thus, blanket parole policies have long been deemed to be improper.

In *Roberts v. Duffy* (1914) 167 Cal. 629 [140 P. 260], a decision that predates the enactment of our state's old indeterminate sentencing law, the court condemned a blanket parole policy that was contrary to the statutory parole scheme then in place. It appeared that the statutory law allowed a prisoner to apply for parole after serving one year but that, contrary to the statute, the parole authority adopted a rule precluding application until one-half the sentence was served, except in extraordinary circumstances. The court held that, while the prisoner had no right to release on parole at any time, he was entitled to apply and have his application duly considered on an individualized basis. (*Id.* at pp. 640-641.)

In *In re Minnis, supra,* 7 Cal.3d 639, a decision under the indeterminate sentencing law, the court reached a similar conclusion. On initial consideration, the former Adult Authority, which was responsible for both fixing terms and granting parole, set the petitioner's term at maximum, denied parole, and ordered that there would be no further consideration, apparently based upon the type of offense committed by the prisoner. (*Id.* at p. 642.) The court concluded that, in view of the circumstances of the petitioner's offense, the Adult Authority could reasonably set the term at maximum and deny parole at the initial hearing; but it could not refuse in advance to consider future applications. (*Id.* at p. 647.) To do so would deprive the petitioner of the individualized consideration to which he was entitled. (*Ibid.*)

We recognize that the emphasis of our state's criminal law changed with the major revision of our sentencing laws that became effective in 1977. The state now places greater importance on punishment as the purpose of imprisonment. (Pen. Code, § 1170, subd. (a)(1).) With respect to persons sentenced to indeterminate terms, the purpose of punishment is satisfied by the requirement of service of a minimum period before eligibility for parole and, when suitable for parole, by the determination of a release date in a manner that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public. (Pen. Code, § 3041, subd. (a).) The determination of suitability for parole focuses on public safety, and primary considerations in that respect are the gravity of the commitment offense or offenses, and the timing and gravity of current and past convicted offenses. (Pen. Code, § 3041, subd. (b).)

However, while the focus of our criminal law has changed, the reasoning of the decisions in *Roberts v. Duffy, supra,* 167 Cal. 629, and *In re Minnis, supra,* 7 Cal.3d 639, has not. As before, the law requires that, when an inmate becomes eligible for parole, he is entitled to individualized consideration of his suitability for parole. (Pen. Code, §§ 3041, 3041.5.) A refusal to consider the particular circumstances relevant to an inmate's individual suitability for parole would be contrary to the law.

## B

In deciding to reverse the Board's decision that Morrall is suitable for parole, Governor Davis represented that he had considered the same factors that were considered by the Board. He gave Morrall a written statement of reasons for the decision, which was focused on the individual circumstances of Morrall's case. On its face, it appears that the Governor gave Morrall the individual consideration to which he was entitled.

However, Morrall contends the Governor's representation that he gave individual consideration to Morrall's case is belied by certain statements the Governor has made to reporters.

It appears that, in April 1999, shortly after taking office, Governor Davis was asked whether extenuating circumstances should be a factor in murder sentences. He reportedly said: "No. Zero." The Governor also is reported to have said: "If you take a life, you rob many people of someone they love, depend upon emotionally, financially . . . or whatever. The reason that motivated you to do it matters less to me than recognizing the pain caused by your act." With respect to the suggestion that his tough-minded approach to crime might surprise some supporters, the Governor is reported to have said that they must not have been listening when he was campaigning, and "[i]f you take someone else's life, forget it. I just think people dismiss what I said in the campaign as either political hyperbole or something that I would back away from. . . . We are doing exactly what we said we were going to do."

On the other hand, in the same interview, Governor Davis reflected on the first request for clemency from a death row inmate that he was required to consider. He reportedly said: "The first day I was reviewing this, it struck me—this is an incredible amount of power. The second day, I got beyond that. I realized that I have to do my job. The jury did its job, and all of the state courts did their job." When it was suggested that the next request for clemency the Governor might have to consider would be from a Vietnam veteran who claimed to suffer from posttraumatic stress disorder from the war, the Governor is reported to have said: "I have great respect for anyone that served their country, but I feel very strongly that nobody should take another person's life. I think I can separate my regard for his sense of patriotism from any culpability that I determine he has for the act. That is all said hypothetically because I haven't seen the case."

These latter statements indicate that Governor Davis is aware of the difference between general rhetoric and the specific duties of his office. They suggest that his general statements were an attempt to debunk the notion that, upon election, he would become a soft-on-crime liberal; and they tend to rebut the claim that he was indicating he would refuse to consider particular cases on an individual basis.

Moreover, the record contains an article that appeared in the San Francisco Daily Journal, dated September 14, 2000. There, the Governor's deputy press secretary insisted that the Governor has no blanket policy against parole, and said: "Every case that comes before him is reviewed independently on its merits."

As we already have observed, the determination whether an inmate is suitable for parole is an executive decision rather than a judicial determination. The process contemplates the synthesis of facts and observations filtered through the experience of the decision maker to arrive at a predictive judgment. (*Greenholtz v. Nebraska Penal Inmates, supra,* 442 U.S. at p. 8 [99 S.Ct. at p. 2104, 60 L.Ed.2d at p. 676].) "[W]e can say with some assurance that where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions." (*Garner v. Jones* (2000) 529 U.S. 244, 253 [120 S.Ct. 1362, 1369, 146 L.Ed.2d 236, 246].)

■ Although principles of due process apply, the parole authority is not required to proceed with the formality required of courts. (*In re Powell, supra,* 45 Cal.3d at p. 904.) And, even in a court setting, a litigant is not entitled to insist upon a decision maker who has never expressed a viewpoint.[5]

■ The Governor is vested with the supreme executive power of the state. (Cal. Const., art. V, § 1.) In the exercise of his executive authority, he is not bound by the standards applicable to judges. However, even if we were to apply those standards, Governor Davis's general rhetoric uttered to reporters shortly after he assumed office would not disqualify him from exercising gubernatorial authority.

---

[5]Code of Civil Procedure section 170.2, subdivision (b), provides that a judge is not disqualified simply because he or she "[h]as in any capacity expressed a view on a legal or factual issue presented in the proceeding." Thus, in *Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781 [171 Cal.Rptr. 590, 623 P.2d 151], the court said: "Not only would it be extraordinary to find a judicial officer who is totally without a thought on all issues, the discovery of such a rare intellectual eunuch would suggest an adverse reflection on his qualifications." (*Id.* at p. 791.) With respect to the contention that an administrative law officer (ALO) should be disqualified for harboring viewpoints, the court said: "Similarly, it would be untenable for this court to insist upon selection only of ALOs who have never thought about or expressed an opinion on the broad social, economic or legal issues that inherently underlie a labor dispute." (*Ibid.*)

C

Morrall argues that Governor Davis's actions speak louder than his words. Morrall asserts that, since the Governor took office, the Board has determined that 48 life prisoners were suitable for parole and that the Governor has reversed all but one of those determinations.

The Governor's reversal of the Board's determinations does not establish that he refuses to consider the individual merits of the suitability for parole of prisoners whom he considers. Nor does it rebut the Governor's representation that he considered the individual merits of Morrall's application. The Governor's decisions simply may indicate that he strictly scrutinizes the Board's determinations regarding suitability for parole and that he is more stringent on the issue of the public safety.

It is true that our system of government provides checks and balances among the departments of government. However, with respect to the exercise of executive authority, we rely in the first instance upon the Governor's fidelity to the duties of his office. (See *State of South Dakota v. Brown* (1978) 20 Cal.3d 765, 769, 771 [144 Cal.Rptr. 758, 576 P.2d 473].) As we shall explain more fully in the next part of this opinion, once the Governor has made a decision on parole, the courts can review that decision via a writ of habeas corpus. (*In re Arafiles, supra,* 6 Cal.App.4th at p. 1481.) And, while the Legislature cannot directly supervise the Governor's performance of his duties in particular cases, it can by statute dictate the factors to be considered and the standards to be applied in making parole determinations. (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 304 [105 Cal.Rptr.2d 636, 20 P.3d 533]; *California Radioactive Materials Management Forum v. Department of Health Services* (1993) 15 Cal.App.4th 841, 873 [19 Cal.Rptr.2d 357], disapproved on the erroneous assumption the decision said otherwise in *Carmel Valley Fire Protection Dist. v. State of California.*)[6]

As a court, we must rely upon these checks and balances. We cannot call the Governor on the carpet to demand assurances that the law will be obeyed. (*Alfaro v. Terhune* (2002) 98 Cal.App.4th 492, 512 [120 Cal.Rptr.2d 197]; *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095, 1100-1101 [97 Cal.Rptr.2d 382]; *Donaldson v. Lungren* (1992) 2 Cal.App.4th 1614, 1623 [4 Cal.Rptr.2d 59]; *Deukmejian v. Superior Court* (1983) 143 Cal.App.3d 632, 635 [191 Cal.Rptr. 905].) Nor may we arrogate to ourselves

---

[6]The Constitution, in article V, section 8, subdivision (b), requires that when the Governor reviews a parole decision of the Board, he must report his decision to the Legislature with the pertinent facts and reasons for his action. This can only have been intended to aid the Legislature in its authority to provide oversight through statutory enactment. (*Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 63 [112 Cal.Rptr.2d 5].)

the exercise of authority that the Constitution expressly vests in the Governor. (*Carmel Valley Fire Protection Dist. v. State of California, supra,* 25 Cal.4th at p. 297.)

On this record, Morrall has failed to establish that the Governor has unilaterally dismantled the parole system through a blanket policy of denying parole to persons convicted of murder.

### III

■ We now turn to the Attorney General's contention that the constitutional separation of powers doctrine precludes judicial review of the merits of the Governor's decision.

A state may, if it chooses, vest an executive authority with wholly unfettered discretion in parole matters. (*Greenholtz v. Nebraska Penal Inmates, supra,* 442 U.S. at p. 8 [99 S.Ct. at p. 2104, 60 L.Ed.2d at p. 676].) In that instance, an inmate would have a mere hope of obtaining parole, and a mere hope is insufficient to trigger due process protections. (*Id.* at p. 11 [99 S.Ct. at pp. 2105-2106, 60 L.Ed.2d at pp. 677-678].)[7] But when a state's parole scheme is such as to vest a prisoner with an expectation of parole, absent countervailing considerations, then at least minimal due process protections are triggered. (*Id.* at pp. 11-12 [99 S.Ct. at pp. 2105-2106, 60 L.Ed.2d at pp. 678-679].) Although our state parole scheme vests broad discretion in the parole authority, the discretion is not absolute; and we regard it as settled that inmates are entitled to due process in the determination. (*In re Powell, supra,* 45 Cal.3d at p. 902.)

Thus, decisions of the California Supreme Court have evinced "a limited cognizance of rights of parole applicants to be free from an arbitrary parole decision, to secure information necessary to prepare for interviews with the Authority, and to something more than mere pro forma consideration. Under time-honored principles of the common law, these incidents of the parole applicant's right to 'due consideration' cannot exist in any practical sense unless there also exists a remedy against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268 [113 Cal.Rptr. 361, 521 P.2d 97].) The right to due consideration of parole applications necessarily gives rise to a concomitant right to an available remedy. And the basic remedy to correct arbitrary action by the parole authority is the writ of habeas corpus. (*Id.* at pp. 268-269.)

---

[7]Even in such a circumstance, a prisoner's continued incarceration would not be entirely free of judicial scrutiny. Judicial relief by writ of habeas corpus to secure a prisoner's release would be available if it is demonstrated that continued incarceration would constitute cruel and unusual punishment in light of the commitment offense. (See *In re Rodriguez, supra,* 14 Cal.3d at pp. 649-651.)

Accordingly, we regard the proposition that an inmate can obtain review of an adverse parole determination by writ of habeas corpus to be too well settled for dispute. (See *In re Arafiles, supra*, 6 Cal.App.4th at p. 1481.)

We reject the Attorney General's suggestion that judicial review is limited to ensuring compliance with procedural safeguards and does not extend to review of the merits of a parole decision. An inmate is entitled to due consideration of an application for parole, and that is "something more than mere pro forma consideration." (*In re Sturm, supra*, 11 Cal.3d at p. 268.) Nominal compliance with procedural requisites would ensure nothing more than pro forma consideration; and it follows that the right to due consideration necessarily gives rise to a right of limited judicial review of the merits of the determination. Thus, with respect to a decision to rescind a parole date, our state Supreme Court has stated: "The board's decision must have a factual basis, and may not be based on 'whim, caprice, or rumor.'" (*In re Powell, supra*, 45 Cal.3d at p. 902.) To ensure adherence to this standard, courts necessarily must be able to provide limited review of the merits of the decision. (*Id.* at pp. 903-904.)

Nothing in article V, section 8, subdivision (b) of our state Constitution, giving the Governor the authority to review and modify or reverse decisions of the Board, alters this state of affairs. In California, no person, including the Governor, is above the law. (*Jenkins v. Knight* (1956) 46 Cal.2d 220, 223 [293 P.2d 6].) Accordingly, it has long been held that the actions of the Governor are not wholly immune from judicial scrutiny. (*Ibid.*; see also *Hollman v. Warren* (1948) 32 Cal.2d 351, 354 [196 P.2d 562]; *Elliott v. Pardee* (1906) 149 Cal. 516, 520 [86 P. 1087].)

The Constitution gives the Governor the authority to exercise his independent judgment with respect to the parole of convicted murderers, but his role is one of review. (*In re Arafiles, supra*, 6 Cal.App.4th at p. 1481.) He is required to consider the record that was before the Board, and to base his decision on the same factors the Board was required to consider. (*Ibid.*) The Governor has not been given unfettered or absolute authority over parole matters, and it follows that courts have authority to consider the merits of the issue to protect against an arbitrary and capricious decision. (*Ibid.*)

However, the scope of judicial review of a Governor's parole decision is necessarily limited. That decision is executive in character and is specifically assigned to the Governor by our Constitution. The Governor's discretion in such matters is " 'great' " and " 'almost unlimited.' " (*In re Powell, supra*, 45 Cal.3d at p. 902.) The scope of judicial review must be firmly rooted in that consideration. (*Dawson v. Town of Los Altos Hills* (1976) 16 Cal.3d 676, 685 [129 Cal.Rptr. 97, 547 P.2d 1377].)

*In re Powell, supra*, 45 Cal.3d 894, considered the standard of review to be applied to a decision of the Board rescinding a parole date. The court noted

that the Board must accomplish the delicate task of striking a balance between the interests of the inmate and of the public, and said that to do so the Board "must operate with broad discretion and not be 'subject to second-guessing upon review.' " (*Id.* at p. 904.) The Board cannot be held to have abused its discretion when it has some basis in fact for its decision. (*Ibid.*) Accordingly, the court rejected the usual substantial evidence rule and held "that due process requires only that there be some evidence to support a rescission of parole by the [Board]." (*Ibid.*)

The "some evidence" standard is consistent with the standard applicable to judicial review of gubernatorial action generally. ■ With respect to actions of the Governor, the distinction between when a court may and may not act lies between acts that are ministerial in character and acts that involve the exercise of judgment and discretion. (*Jenkins v. Knight, supra,* 46 Cal.2d at pp. 223-224.) If there is any measure of judgment or discretion involved in the Governor's actions, a court may not interfere. (*Ibid.*)

■ Under our law, an inmate is entitled to have a parole date set unless it is determined "that consideration of the public safety requires a more lengthy period of incarceration for this individual." (Pen. Code, § 3041, subd. (b).) There must be some basis in fact for an adverse determination. (*In re Powell, supra,* 45 Cal.3d at p. 904.) But where there is some evidence in support of an adverse determination, the decision falls within the broad discretion vested in the executive, and courts cannot second-guess the executive's exercise of judgment and discretion. (*Ibid.*)

Accordingly, we conclude that, when an inmate seeks review of a Governor's parole decision under the authority granted the Governor by the Constitution, we may review the matter to determine whether the Governor has proceeded in the manner required by law.

For example, if the Governor refused to receive and consider the record that was before the Board, or received and relied upon information that was not before the Board, it would appear that he failed to proceed in the manner required by law. (*In re Arafiles, supra,* 6 Cal.App.4th at p. 1481.) And the appropriate remedy would be to refer the matter back to the Governor for a decision based upon, and limited to, appropriate materials. (*In re Minnis, supra,* 7 Cal.3d at p. 651; *Roberts v. Duffy, supra,* 167 Cal. at p. 641.)

If the Governor has proceeded as required by law, and the inmate's complaint is with respect to the merits of the Governor's decision, our review begins and ends with the determination whether there is some evidence in support of the decision. (*In re Powell, supra,* 45 Cal.3d at p. 904.) To constitute some evidence, the information relied upon by the Governor must tend logically, and by reasonable inference, to establish a

fact relevant to the inmate's suitability for parole. (See *Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 125 [52 Cal.Rptr. 561, 416 P.2d 793].) Since the Governor's function is one of review and he is not authorized to establish his own standard of suitability for parole (*In re Arafiles, supra,* 6 Cal.App.4th at p. 1481), the information upon which he relies must be relevant to both the statutory standard and the regulatory factors that the Board was required to consider. (Pen. Code, § 3041, subd. (b); Cal. Code Regs., tit. 15, § 2402.) In this context, the some evidence requirement is satisfied when there is information in the record sufficient to trigger the exercise of some measure of executive judgment and discretion in the application of the statutory and regulatory standards. (*Jenkins v. Knight, supra,* 46 Cal.2d at pp. 223-224.) If so, it must be said that the Governor has some basis in fact for his decision, and we must defer to his exercise of executive discretion. (*In re Powell, supra,* 45 Cal.3d at p. 904.)

■ This brings us to Morrall's claim that Governor Davis's decision to reverse the Board's decision that he is suitable for parole is not supported by any evidence.

## IV

The record contains much information that is favorable to Morrall's prospects on parole. He has no criminal record other than the commitment offense. His prison record reflects only minor disciplinary matters and nothing for many years. It appears that he is well above average in intelligence and has a college education. He served in the military and afterward worked for years as an airplane pilot. While in prison, he trained to be an airplane mechanic and has an offer of employment upon his release. He enjoys strong support from his family and friends. While on bail pending appeal, he remarried and has a son from that union. His wife and son, as well as his surviving son from his prior marriage, support his release. His psychological reports suggest that he would have a low probability of reoffending. He has engaged in self-help reading to understand and learn to control the factors that contributed to the murder. And, while he was 47 years old when he committed the murder, he is now in his late 60's and has served many years in prison in consequence of his conduct.

Morrall argues that Governor Davis did not consider these factors since he did not discuss them in his written decisions. We are not persuaded.

The Constitution requires that when the Governor exercises authority to review decisions of the Board, he must report his decision to the Legislature with a statement of the pertinent facts and reasons for his action. (Cal. Const., art. V, § 8, subd. (b).) The Penal Code requires that when the Governor reverses or modifies a decision, he must give the inmate a written

statement specifying the reasons for the decision. (Pen. Code, § 3041.2, subd. (b).) The Governor is not required to discuss in detail every factor that was considered by the Board.

In both instances in which Governor Davis reviewed a Board decision regarding Morrall, he gave Morrall a written statement saying that he had considered the same factors considered by the Board, and he provided a statement of the specific reasons why he disagreed with the Board. Hence, the Governor's failure to discuss favorable information means only that he had no factual disagreement with respect to the Board's assessment of those factors. It does not mean that he failed to consider them.

The Governor's specific reasons for reversing the decisions of the Board centered around the circumstances of Morrall's crime. The record supports a conclusion that the crime was a particularly egregious murder. Although Morrall claims the crime was the result of stress, the record indicates that most of what he calls stress was actually self-fostered anger. He was angry at the prospect of being compelled to divide the community property with his wife. He was angry at the prospect of having continuing child and spousal support obligations. He was angry that his wife would have custody and thus some control over when he could see the children. He was angry that his wife would stand up for her interests in the dissolution proceedings rather than simply yield to his demands.

The record indicates that, in the months before the murder, Morrall made a number of threats against his wife to her and to others in an effort to get his own way in the dissolution. The victim told a number of persons that Morrall had threatened to kill her or have her killed. There is evidence of prior abusive actions on Morrall's part. And Morrall is reported to have told his parents-in-law that he would have his wife killed and would burn both houses before he ever gave her a dime.

Morrall's wife did not seek him out for a confrontation. Nor did they inadvertently happen to run into each other. Rather, Morrall went to her house to confront her. And he took a loaded gun with him into what he knew would be a volatile confrontation. At first, the victim would not open her door. When she did, he shot her seven times, including a contact wound to the neck. In doing so, he consummated the life-endangering anger he had been harboring, and also deprived his young children of a mother and imposed upon them the stigma of having a murderer for a father.

In determining an inmate's suitability for parole, the pivotal consideration is the public safety. (Pen. Code, § 3041, subd. (b).) The Board, and the Governor on review, are required to consider all relevant, reliable information bearing on the question. (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

Highly significant factors, in fact the only factors specifically identified by the Legislature, are the gravity of the current convicted offense and the timing and gravity of current and past convicted offenses. (Pen. Code, § 3041, subd. (b).) The Board's regulation indicates that the commitment offense will tend to indicate unsuitability for parole if it was committed in an especially heinous, atrocious, or cruel manner. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) As general guidelines, the regulation sets out a number of nonexclusive factors to be considered, including whether multiple victims were attacked, injured, or killed; whether the offense was carried out in a dispassionate and calculated manner; whether the victim was abused, defiled, or mutilated; whether the offense was carried out in a way that demonstrates an exceptionally callous disregard for human suffering; and whether the motive for the crime was inexplicable or very trivial in relation to the offense. (*Ibid.*)

Viewing the crime in a light most favorable to himself, Morrall argues that none of these factors are present. However, the factors identified in the regulation are illustrative rather than exclusive. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) And the Governor is not required to view the record in a light most favorable to the inmate; rather, he is entitled to exercise his own judgment to determine the circumstances surrounding the crime and the weight to be accorded them. (*Elliott v. Pardee, supra*, 149 Cal. at p. 520; see also *In re Powell, supra*, 45 Cal.3d at p. 904.)

In reviewing the Governor's decision, we must view the record in a light most favorable to that determination. (See *In re Powell, supra*, 45 Cal.3d at p. 904.) In this light, we cannot reject the Governor's conclusions that Morrall's offense was particularly heinous, that his actions demonstrate an exceptionally callous disregard for human life and suffering, or that the offense was inexplicable and demonstrates Morrall's inability to control himself or his emotions.

Morrall argues that the nature of his commitment offense alone cannot serve as a basis for a finding that he is unsuitable for parole.

We agree that an inmate cannot be denied parole based simply on the type of offense he committed. (See *In re Minnis, supra*, 7 Cal.3d at p. 647.) The law contemplates that persons convicted of murder may eventually become suitable for parole, and it would be contrary to the statutory scheme to deny parole simply because the commitment offense was murder. However, under the statutory scheme the gravity of the commitment offense is a significant consideration. (Pen. Code, § 3041, subd. (b).) Therefore, upon individualized consideration, the particular circumstances of the inmate's commitment offense may be a basis for finding the inmate unsuitable for parole. (*In re Minnis, supra*, 7 Cal.3d at p. 647; *In re Ramirez* (2001) 94 Cal.App.4th 549,

569 [114 Cal.Rptr.2d 381]; *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, 426, fn. 18 [95 Cal.Rptr.2d 279]; *In re Seabock* (1983) 140 Cal.App.3d 29, 37 [189 Cal.Rptr. 310].)

Morrall suggests that, since he was convicted of second degree murder, the Governor cannot consider any circumstances of the crime that would have supported a finding of first degree murder. (See *In re Rosenkrantz, supra*, 80 Cal.App.4th at p. 425.) We disagree.

To convict a person of first degree murder on a premeditation and deliberation theory, a jury would have to be satisfied beyond a reasonable doubt that the person made a deliberate decision to kill after careful thought and weighing of the considerations for and against killing and while having in mind the consequences of killing. (See CALJIC No. 8.20.) At the time of Morrall's trial, the jury would have had to be satisfied that he decided to kill after mature and meaningful reflection on the gravity of the act. (*People v. Wolff* (1964) 61 Cal.2d 795, 819-822 [40 Cal.Rptr. 271, 394 P.2d 959].)[8] There are a number of circumstances that, if proven, would tend to suggest premeditation and deliberation. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-29 [73 Cal.Rptr. 550, 447 P.2d 942].) But there is no precise evidentiary formula that is regarded as either necessary or sufficient. (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) Circumstances attending the crime that might, with other evidence, tend to suggest premeditation and deliberation do not disappear when, based upon the entire record, the jury harbors a reasonable doubt whether the defendant in fact premeditated and deliberated. For example, in this case, Morrall shot his victim seven times, including what is described as a contact wound to the neck. This was an exacting manner of killing that could serve as one evidentiary component of a first degree murder charge. (*People v. Anderson, supra*, 70 Cal.2d at pp. 26-29.) But that circumstance exists regardless of the jury's rejection of a first degree murder charge.

In exercising his authority over paroles, the Governor can apply a preponderance of the evidence standard. (Evid. Code, § 115.) The Governor's task is not to determine whether premeditation and deliberation attended the crime; instead, it is to evaluate the circumstances of the crime to determine what they indicate with respect to the public safety. (Pen. Code, § 3041, subd. (b).)

Contrary to Morrall's suggestion, all second degree murders do not reflect the same measure of danger to the public safety. (See *People v. Dixie* (1979)

---

[8]Effective January 1, 1982, after Morrall's crime, the Legislature amended Penal Code section 189 to provide that it is not necessary to prove mature and meaningful reflection. (Stats. 1981, ch. 404, § 7, p. 1593.)

98 Cal.App.3d 852, 856 [159 Cal.Rptr. 717].) Rather, the range of conduct that can result in a conviction for second degree murder is extremely broad with respect to such things as the violence, viciousness, cruelty, and callousness exhibited by the defendant. (*Ibid.*)[9] The Governor can, and indeed is required to, consider the specific circumstances of an inmate's crime on an individualized basis in determining suitability for parole.

In reversing the Board's suitability for parole determination in 2001, Governor Davis noted that Morrall "has had only limited involvement in stress or anger management programming, which includes a two-month anger management program in 1989, some individual therapy and, apparently in response to the 1998 parole suitability hearing panel's recommendation, some in-cell study." The Governor noted that, in 1998, the Board advised Morrall that he needed therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner, and that in 2001 the Board concluded that release should be dependent upon additional anger management counseling. In reversing the Board's decision, the Governor relied in part on a need for additional stress and anger management programming.

Morrall takes issue with this factor, asserting that he has undergone extensive individual psychotherapy and has participated in every available self-help and rehabilitative program. However, the record before us does not establish this assertion, and it is apparent that we do not have the whole record that was before the Board and the Governor. To the extent Morrall wishes to challenge the Governor's factual determinations, it was his burden to provide us with an adequate record to evaluate the claim. (*In re Arafiles, supra,* 6 Cal.App.4th at p. 1477.)

The available record indicates that Morrall's psychological profiles are not entirely favorable. During argument at his parole suitability hearing in June 2001, the district attorney stated: "The psychological reports are favorable, but if we look at all of them, they're really, they're kind of across the [b]oard. There are some originally that say he has a narcissistic personality disorder, there are others that say he has no problem whatsoever. I think at best, you could say they're contradictory all-in-all." A 1998 evaluation,

---

[9]*In re Rosenkrantz, supra,* 80 Cal.App.4th 409 held that an " 'exceptionally callous disregard for human suffering' " cannot possibly support the denial of parole for a second degree murderer, because it necessarily applies to every second degree murder. (*Id.* at p. 425.) But the cases cited in the decision do not support that assertion. In *People v. Dixie, supra,* 98 Cal.App.3d at page 856, this court stated that a similar contention with respect to sentencing was "patently incorrect." (See also *People v. Castorena* (1996) 51 Cal.App.4th 558, 562-563 [59 Cal.Rptr.2d 782]; *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1776 [39 Cal.Rptr.2d 73]; *People v. Clark* (1992) 12 Cal.App.4th 663, 666 [15 Cal.Rptr.2d 709]; *People v. Garcia* (1989) 209 Cal.App.3d 790, 793 [257 Cal.Rptr. 495]; *People v. Reed* (1984) 157 Cal.App.3d 489, 491 [203 Cal.Rptr. 659].)

which was before the Board and is included in the record on habeas corpus, was generally favorable and identified a number of specific factors that are favorable to Morrall. But it also indicates that his personality profile is one in which "[d]epression and hopelessness are common, and he presents a strong need for attention and to avoid rejection by persons perceived as significant in his life. Insight is limited with such persons, and he attempts to present himself in a favorable moral and social light." The report further states: "He could work towards recognizing his sensitivity to rejection and failure, and learning to recognize and express his emotions honestly within his more trusting relationships. However, it is understandable how superficial respect and compliance would be reinforced within this very rigid authority structure." In addition, the record indicates, as the Governor found, that Morrall's primary response to the need for stress and anger management programming has been self-help reading.

In the final analysis, it is not for this court to determine whether Morrall is suitable for parole, or to second-guess the Governor's determination that he is not. We must view the record in a light most favorable to the Governor's decision, and must defer to the Governor's exercise of discretion if there is some basis in fact for his decision. (*In re Powell, supra*, 45 Cal.3d at p. 904.) On the record presented, we cannot say that there is no evidence supportive of the Governor's decision. Accordingly, we must reject Morrall's contention that he is entitled to release on parole.

V

■ Lastly, we address Morrall's contention that the Governor's parole suitability decision violates principles of due process and the prohibition against the ex post facto application of penal laws.

*In re Arafiles, supra*, 6 Cal.App.4th 1467, a decision by this court, rejected a claim that the Governor's authority to review parole decisions violates principles of due process. The decision noted that an inmate has the right to an appropriate hearing before the Board; the Governor's review is limited to the record that was before the Board, and he is required to base his decision on the same factors the Board was required to consider; the Governor is required to provide a written statement specifying his reasons for reversing or modifying a decision of the Board; and the Governor's decision is subject to review by writ of habeas corpus. It held that these procedures are sufficient to satisfy the requirements of due process. (*Id.* at pp. 1480-1481.)

■ *In re Arafiles* also considered and rejected the contention that, with respect to inmates whose crimes were committed before the addition of article V, section 8, subdivision (b), to the state Constitution, the Governor's review of parole decisions violates the prohibition against ex post facto laws.

(*In re Arafiles, supra,* 6 Cal.App.4th at pp. 1481-1488.) It concluded: "Parole release decisions have always been within the exclusive province of the executive branch. Allowing for or removing discretionary gubernatorial review of parole release decisions in no way affects petitioner's substantial right to seek parole or to have that right properly considered." (*Id.* at p. 1487.)

We find *In re Arafiles* to be persuasive and adhere to it. Accordingly, we reject Morrall's contention that gubernatorial review of parole decisions violates principles of due process or constitutes a prohibited ex post facto law.

In claiming that the prohibition against ex post facto laws precludes the Governor from reviewing and reversing the Board's determination that Morrall is unsuitable for parole, Morrall's petition for writ of habeas corpus and his points and authorities in support thereof do not cite the United States Supreme Court's decision in *Garner v. Jones, supra,* 529 U.S. 244. Morrall does refer to that decision in his "denial and memorandum of points and authorities in support thereof," filed after the People's return to the order to show cause. However, Morrall does not cite or rely upon it in his petition for rehearing filed after we issued our opinion in this case on September 23, 2002.

In denying Morrall's petition for rehearing, we take this opportunity to explain why the decision in *Garner v. Jones* is of no assistance to him.

*Garner v. Jones* addressed a matter not at issue in this case. The change of Georgia law considered there was a parole board rule extending, from three to eight years, the period between automatic parole hearings for some prisoners. (*Garner v. Jones, supra,* 529 U.S. at pp. 246-247 [120 S.Ct. at p. 1365, 146 L.Ed.2d at p. 242].) Like in the earlier case of *California Dept. of Corrections v. Morales* (1995) 514 U.S. 499 [115 S.Ct. 1597, 131 L.Ed.2d 588], the rule change in *Garner v. Jones* did not alter the standards for exercising discretion in the determination of an inmate's suitability for parole. (*Garner v. Jones, supra,* 529 U.S. at pp. 250, 252-253, 254 [120 S.Ct. at pp. 1367, 1369, 1369-1370, 146 L.Ed.2d at pp. 244, 245-246, 246].) Rather, the "essence" of the inmate's case was "not that discretion has been changed in its exercise but that, in the period between parole reviews, it will not be exercised at all." (*Id.* at p. 254 [120 S.Ct. at p. 1369, 146 L.Ed.2d at p. 246].) Thus, the question was whether the retroactive change in the *frequency* of parole hearings created a sufficient risk of a longer period of incarceration than under the earlier rule for an inmate convicted prior to the rule change. (*Id.* at pp. 252, 255 [120 S.Ct. at pp. 1368, 1370, 146 L.Ed.2d at pp. 245, 247].) The Supreme Court found no ex post facto violation on the record in that case because (1) the rule change vested the parole board with

discretion as to how often to set a parole hearing, with eight years as the maximum period between hearings, and permitted " 'expedited parole reviews in the event of a change in their circumstance or where the [parole board] receives new information that would warrant a sooner review' " (*id.* at pp. 254, 256-257 [120 S.Ct. at pp. 1369, 1371, 146 L.Ed.2d at pp. 246-247, 248]); (2) this change did not by its own terms demonstrate a significant risk of increased punishment (*id.* at p. 255 [120 S.Ct. at p. 1370, 146 L.Ed.2d at p. 247]); and (3) the inmate failed to demonstrate, by evidence drawn from the parole board's actual implementation of the rule change, that it will result in a longer period of incarceration than under the earlier rule (*id.* at pp. 255, 256-257 [120 S.Ct. at pp. 1365, 1366, 146 L.Ed.2d at pp. 247, 248]).

The change in law at issue in this case does not alter the *frequency* of parole hearings and does not alter the *standards* the executive branch must use in the exercise of its discretion when determining whether an inmate is suitable for parole. It simply provides that the executive decision whether an inmate is suitable for parole does not stop at the Board but is subject to review by the chief of the executive branch—the Governor—who stands in the shoes of the Board and whose determination must be based upon the same record that was before the Board and upon the same factors that the Board was required to consider.

Although *Garner v. Jones* did not address this situation, the United States Supreme Court recognized the very idea of discretion contemplates that it is subject to changes in the manner in which it is informed and then exercised. (*Garner v. Jones, supra,* 529 U.S. at p. 253 [120 S.Ct. at p. 1369, 146 L.Ed.2d at p. 246].) In other words, the court implied that a change in the exercise of discretion, rather than in the factors to be considered, does not violate the ex post facto clause, even if a longer period of incarceration might result.

That implication is consistent with the decision of *In re Arafiles, supra,* 6 Cal.App.4th 1467, in which this court drew a parallel to a United States Supreme Court opinion holding that a state law permitting the People to appeal an intermediate court reversal of a criminal conviction did not violate the ex post facto clause. (*Id.* at pp. 1485-1486.) "If allowing for higher court review of intermediate court decisions does not violate ex post facto proscriptions, we fail to see how allowing for executive review of parole decisions can be otherwise." (*Id.* at p. 1486.)

Simply stated, a change in the person or persons within the executive branch who has or have final say in the suitability for parole determination does not violate the ex post facto clause. Because Morrall did not rely on *Garner v. Jones, supra,* 529 U.S. 244, and since that decision is not on point

with respect to the aforesaid issue, a simple reference to *In re Arafiles*, *supra*, 6 Cal.App.4th at pages 1481-1488, which correctly resolved the question, is sufficient.

## DISPOSITION

The petition for a writ of habeas corpus is denied. Having served its purpose, the order to show cause previously issued is discharged with the finality of this decision.

Blease, J., and Hull, J., concurred.

A petition for a rehearing was denied October 10, 2002, and on October 10, 2002, and October 16, 2002, the opinion was modified to read as printed above.