[No. E032032. Fourth Dist., Div. Two. Mar. 1, 2004.]

In re LESLIE VAN HOUTEN on Habeas Corpus.

## COUNSEL

Bill Lockyer, Attorney General, David P. Druliner, Special Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, Susan Duncan Lee, Julie L. Garland and Heather L. Bushman, Deputy Attorneys General, for Appellant.

Law Offices of Christie E. Webb and Christie E. Webb for Respondent.

## OPINION

**RAMIREZ, P. J.**—Appellant John Dovey, Warden of the California Institution for Women, appeals from the superior court order filed June 3, 2002, on the petition for writ of habeas corpus filed by Leslie Van Houten (Van Houten). The trial court order grants the petition "to the extent that the matter is remanded back to the . . . Board [of Prison Terms] to make findings which contain the facts from the record which the Board finds to be 'some evidence' as a basis for the finding that the positive factors demonstrated regarding [Van Houten] and her institution[al] performance are outweighed by the gravity of the offense [citation] which is and will continue to be an unchanging factor. The Board is also to cite some evidence from the record that supports the conclusion that the gravity of the convicted offense is such that consideration of the public safety requires a more lengthy period of incarceration in light of the positive factors showing suitability for parole. The Board is also to make some findings containing the facts from the record which it considers consisting of 'some evidence' that support the conclusion that [Van Houten's] engaging in further institutional participation will result in her being less dangerous than she is at the present time."

Appellant contends that the superior court ignored the "some evidence" standard of review and exceeded its authority in directing the Board of Prison

Terms (the Board) to make particular findings and to explain its decision. After a thorough review of an extensive record of the Board's proceedings since Van Houten was first considered for parole, we agree with appellant that the trial court erred by applying an incorrect standard of review to the Board's parole denial, and we reverse the order granting the petition. By that reversal we affirm the Board's serious, deliberate, and thoughtful decision in a difficult case. Therefore, we do not reach the second contention regarding the scope of the trial court's directions to the Board.

FACTS

Van Houten's life before her crime exemplified both the typical and the terrifying in Southern California during the late 1960's. She was in some respects a normal teenager. Her family attended a Presbyterian church where she sang in the choir, went to the youth fellowship, and enjoyed church camp every summer. She went to high school in Monrovia, California, graduating in 1967. While in high school, she was a homecoming queen and class secretary and participated in Campfire Girls and Job's Daughters. After high school she went to Sawyer College for a year earning a legal secretary certificate.

In other respects, her life exhibited dangerous instability. At 14 she began using marijuana, methedrine, mescaline, and benzedrine. She reported taking 150 "trips" on LSD by the age of 19. Her parents divorced when she was 14, and she became pregnant at 17 and either miscarried or had an abortion. She lived with her mother until graduation from high school and then with her father and stepmother during the year she attended Sawyer College. After gaining her certificate from Sawyer in 1968, she left home and met a boyfriend with whom she lived and traveled up and down the West Coast for about five months.

In San Jose, California, Van Houten heard about a commune at the Spahn Ranch in Chatsworth, California, and began living there attracted by the communal lifestyle. Charles Manson (Manson) had established the commune with about 20 companions who had gathered around him in the Haight-Ashbury area where he had gone after his release from prison in 1967. (See *People v. Manson* (1976) 61 Cal.App.3d 102, 126–127 [132 Cal.Rptr. 265].) The group, which became known as "the Family," was allowed to live at the ranch in exchange for the men maintaining ranch trucks and the women performing domestic and secretarial work. (*Id.* at p. 127.) By August 1969 the members included Van Houten, Charles Tex Watson (Watson), Susan Atkins (Atkins), Patricia Krenwinkel (Krenwinkel), Linda Kasabian (Kasabian), Steven Grogan (Grogan), and others. (*Id.* at p. 127.)

Initially, life at the ranch seemed idyllic to Van Houten according to the counter-culture standards of the late 1960's. She described the ranch as "this wonderful commune of kids, and the women all embroidered all the time, and you took care of the kids . . . ." Soon, however, the sinister side of the Family emerged. (See *People v. Manson, supra*, 61 Cal.App.3d at pp. 127–130.) Manson dominated and manipulated the members of the Family. (See *ibid.*) Within the context of isolation, dependence, fear, drugs, sex, and indoctrination of the Family experience, the members became convinced of Manson's peculiar apocalyptic fantasies and goals. [1] (See *id.* at pp. 126–130, 205–206.) Van Houten, as a member of the Family, shared Manson's beliefs, goals, and means, which included the murders required to start the revolution they envisioned. (*Id.* at pp. 128–130, 205.) [2]

On the evening of August 8 or early morning of August 9, 1969, and following Manson's instructions, Watson, Atkins, Krenwinkel, and Kasabian brutally murdered Sharon Tate Polanski, Voitcek Frykowski, Abigail Folger, Jay Sebring, and Steven Parent, subsequently referred to as the "Tate murders." (See *People v. Manson, supra*, 61 Cal.App.3d at pp. 131-132;

[1] Manson believed that the Beatles in their song, "Helter Skelter," were warning him of an impending bloody, civilization-ending, worldwide race war between Blacks and Whites. During this war Manson and his followers would hide in a bottomless pit in Death Valley. Manson foretold that the Blacks would succeed in their "revolution," but that the Family would emerge from the pit to take control and restore order. Manson came to believe that he would have to precipitate the race war by murdering Whites in the way he thought Blacks would do it in the race war and in such a way that Blacks would be blamed for the murders. (See *People v. Manson, supra*, 61 Cal.App.3d at pp. 129–130, 131, 139–140.)

[2] In Van Houten's petition for rehearing, she objects to our statement that she shared Manson's beliefs justifying the murders. As pointed out in the petition, for our statement we rely on *People v. Manson, supra*, 61 Cal.App.3d at pages 128-130, 205, which reflects the evidence from the first trial in 1971. The jury in that trial did not hear the psychiatric testimony introduced in her second trial in 1977 and her third trial in 1978 that, as Van Houten says in the rehearing petition, she had not been "capable of meaningfully reflecting on the gravity of the contemplated acts, and that the Manson cult was not an ordinary criminal gang involved in a conspiracy." Indeed, in response to this evidence, it is plausible to infer that the reason the People in the third trial requested and received a felony-murder instruction was to avoid the possibility of another hung jury, as occurred in the second trial.

Nevertheless, the Board found that Van Houten shared the same intent as her codefendants in committing the murders. Our statement reflects that finding, which finds support, for example, in Van Houten's testimony at the parole hearing described in the text following this footnote (*post*, p. 345) that "she was crazy enough to believe in [Manson] and what he was doing . . . ." The Board had before it the opinion of Van Houten's and the Board's experts, but still found, for example, that "there was an intent on the part of the inmate and her crime partners to make this look like . . . a racial killing . . . in order to perpetuate the helter skelter as it was described by Charles Manson . . . ." As established in our discussion of the standard of review in this case (*post*, pp. 347–348), the Board is not limited by what the juries in the second and third trials did or did not decide, and we could not reverse if the record in this case contained, which it does not, evidence of suitability far outweighing the evidence of unsuitability.

*People v. Van Houten* (1980) 113 Cal.App.3d 280, 284 [170 Cal.Rptr. 189].) The victims were trapped in or pursued through and about the Polanski residence and shot or clubbed or stabbed multiple times. (See *People v. Van Houten, supra,* 113 Cal.App.3d at p. 284; *People v. Manson, supra,* 61 Cal.App.3d at pp. 131-132.) The murderers returned to the ranch and reported to Manson. (*Id.* at p. 132.)

Sometime the next day, August 9, 1969, after Atkins and Krenwinkel returned, they told Van Houten that they had committed the Tate murders. Van Houten felt "left out" and wanted to be included next time. Manson approached Van Houten and asked her "if she was crazy enough to believe in him and what he was doing" and Van Houten "said yes." After dinner that night, Manson told Van Houten and other members of the Family that the murders of the previous evening had been "too messy" and that he would show them how it should be done. (*People v. Manson, supra,* 61 Cal.App.3d at p. 227.)

Manson, Van Houten, Watson, Krenwinkel, Atkins, Grogan, and Kasabian got in a car. (*People v. Manson, supra,* 61 Cal.App.3d at pp. 132–133.) As instructed by Manson, Van Houten took a change of clothes with her in case her clothes got bloody. Kasabian drove, following Manson's apparently random directions for about four hours selecting and discarding possible victims, until Manson told her to stop in front of the residence of Harold True on Cielo Drive. (*People v. Manson, supra,* 61 Cal.App.3d at pp. 133, 147.) Manson was acquainted with the residence. (*Id.* at p. 147.) Kasabian knew Harold True, who was known to some of the Family, and told Manson he could not go there. (*Id.* at p. 133.) Manson said he was going to the house next door, which was on Waverly Drive and belonged to the La Biancas. (*Id.* at pp. 133, 147.)

Manson and Watson went inside first and surprised and tied up the La Biancas. Manson returned alone several minutes later reporting that he had tied up a man and a woman and "got their wallet." (*People v. Manson, supra,* 61 Cal.App.3d at pp. 133, 227.) Speaking directly to Krenwinkel and Van Houten, Manson told them to go into the house and do what Watson told them to. He also told them not to let the victims know they would be murdered. (*Ibid.*) The purpose of this advice was to avoid the chaos of the Tate murders. (*Id.* at pp. 131–133.) Van Houten and Krenwinkel went into the residence and found Watson holding the La Biancas at the point of his bayonet. While Krenwinkel and Van Houten went into the La Bianca residence, Manson and the others drove away. (*Id.* at p. 133.) Manson had Kasabian plant the La Biancas' wallet in a gas station restroom hoping that it would be discovered by a Black person who would use the credit card and be blamed for the theft and murder. (*Ibid.*)

At the La Bianca residence, Watson asked the victims if they had any money. Mrs. La Bianca's hands were untied and she brought out a small box of money. Watson told Van Houten and Krenwinkel to take Mrs. La Bianca into her bedroom and kill her. Van Houten and Krenwinkel took Mrs. La Bianca to her bedroom. At some point Krenwinkel went into the kitchen and brought back some knives and gave Van Houten one. Van Houten then put a pillowcase over Mrs. La Bianca's head and wrapped a lamp cord still attached to the lamp around her neck. Mrs. La Bianca heard "[t]he sound of [her husband] being stabbed and a guttural sound of his breathing" in the living room, and she forced her way up from the bed, yelling her husband's name. Mrs. La Bianca grabbed the lamp attached to the cord around her neck and swung the lamp at Van Houten. Van Houten knocked the lamp out of Mrs. La Bianca's hand and wrestled her back onto the bed where she pinned her down so that Krenwinkel could stab her. Krenwinkel plunged a knife taken earlier from the La Bianca kitchen with such force down on Mrs. La Bianca's collarbone that the knife blade bent.

Van Houten ran to the hallway calling for Watson, who came into Mrs. La Bianca's bedroom with the bayonet. According to Van Houten, she turned away from Mrs. La Bianca, and Watson stabbed Mrs. La Bianca with the bayonet eight times. Each of the eight stab wounds was made by a bayonet probably wielded by Watson because of the force required to produce the deep wounds. Each of the eight stab wounds alone could have been fatal, seven of which were in the back. Then Watson turned Van Houten around, handed her a knife, and told her to do something. At that moment, Van Houten saw Mrs. La Bianca lying still on the floor. She said that she "felt" Mrs. La Bianca was dead, but she "didn't know for sure."

Van Houten then used the knife Watson gave her to stab Mrs. La Bianca. She admitted at one point stabbing her in the lower back 16 times, and at another point she said she stabbed her 14 times. Mrs. La Bianca was stabbed a total of 42 times. According to Diane Lake, another Family member, Van Houten told her that "she had stabbed a woman who was already dead, and that the more she did it the more fun it was." (*People v. Manson, supra*, 61 Cal.App.3d at p. 227.)

After the stabbing, Van Houten thoroughly wiped away the perpetrators' fingerprints while Krenwinkel wrote in blood on various surfaces in the residence. (*People v. Manson, supra*, 61 Cal.App.3d at p. 149 & fn. 32.) She gave the extra clothes she brought to Watson when he asked for them, and Watson told her to put on some of Mrs. La Bianca's clothes, which she did, and discarded in a dumpster the clothing they had come in. She drank some chocolate milk from the La Biancas' refrigerator. Back at the Spahn Ranch, she burned Mrs. La Bianca's clothes that she was wearing and counted the $8 and change in Mrs. La Bianca's box. Van Houten hid out for over two months at a remote location and was not arrested until November 25, 1969.

In 1971 a jury convicted Van Houten of two counts of first degree murder and one count of conspiracy to commit murder and imposed the death sentence. (*People v. Van Houten, supra,* 113 Cal.App.3d at p. 283.) The judgment was reversed because of the midtrial disappearance of Van Houten's attorney. (*Ibid.; People v. Manson, supra,* 61 Cal.App.3d at pp. 197–198, 202–203, 217.) In the subsequent retrial the jury deadlocked, resulting in a mistrial. (*People v. Van Houten, supra,* 113 Cal.App.3d at p. 283.) Van Houten was tried a third time, and the jury again convicted her of one count of conspiracy to commit first degree murder and two counts of first degree murder. (*Id.* at p. 284.) However, the jury in this third trial was not required to decide that she premeditated and deliberated the murder because the trial court also gave felony-murder instructions. Concurrent life sentences with the possibility of parole were imposed. (*Ibid.*) On appeal the judgment was affirmed, and in the same opinion a petition for habeas corpus was denied. (*Id.* at p. 293.)

Van Houten returned to prison with a good attitude, which she has maintained since, as demonstrated by consistently good reports and evaluations concerning her participation and leadership in self-help, service, education, counseling, religious programs, and her work assignments. She has a friend to live with and a job awaiting her should she ever leave prison. She also plans to continue her college education and become an editor. The June 2000 parole denial under consideration here was her twelfth in about 22 years since she first became eligible in 1978.

THE SUPERIOR COURT EXCEEDED THE STANDARD OF REVIEW

*Law*

A court reviewing a denial of parole by the Board can only scrutinize the decision to the point of finding "some evidence" supporting it. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658, 665, 677, 679 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).)[3] This standard of review does not require a review of the entire record, but only requires such review as is necessary to

---

[3] This California Supreme Court case was decided in December 2002 after the trial court ruling under review in this case was rendered in June 2002. Not available to the trial court judge in this case, it clearly and authoritatively sets forth the standard of review applicable to appellate courts in reviewing Board denials of parole. Although the holding in *Rosenkrantz, supra,* 29 Cal.4th 616, deals with review of the Governor's decision to reverse the setting of a parole date, on the way to deciding the standard of review for the Governor's decision, the Supreme Court defined the standard of review of a grant or denial of parole by the Board and held that the standard is the same as for review of a Governor's parole denial. (*Id.* at pp. 625–626.) Since the standards of review are the same, the Supreme Court's analysis of the Governor's reasons for his decision in *Rosenkrantz* instructs us in our review of the Board's decision in this case.

determine whether there is *any* evidence in the record supporting the denial.[4] (*Id.* at p. 665.) Once the factors considered are supported by "some evidence," "the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*Id.* at p. 677.)

"One year prior to the inmate's minimum eligible parole release date a panel consisting of at least two commissioners of the Board of Prison Terms shall again meet with the inmate and shall normally set a parole release date as provided in [Penal Code] Section 3041.5. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . ." (Pen. Code, § 3041, subd. (a).) "The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual . . . ." (Pen. Code, § 3041, subd. (b).)

█ The factors respecting the crime that tend to show unsuitability for parole are: (1) multiple victims; (2) "a dispassionate and calculated manner, such as an execution-style murder"; (3) abuse, defilement, or mutilation of the victim during or after the offense; (4) "an exceptionally callous disregard for human suffering"; and (5) an inexplicable or trivial motive. (Cal. Code Regs., tit. 15, § 2281, subd. (c)(1)(A)–(E).)[5] The character of the offense by itself may justify a denial of parole if the offense involves "particularly egregious acts beyond the minimum necessary to sustain" the conviction. (*Rosenkrantz, supra,* 29 Cal.4th at p. 683.)

█ The other circumstances tending to show unsuitability for parole, which are to be considered along with the character of the offense as they relate to the individual prisoner, include: (1) prior violence; (2) history of unstable relationships; (3) sadistic sexual offenses; (4) "lengthy history of severe mental problems related to the offense"; and (5) serious misconduct in prison. (§ 2281, subd. (c)(2)–(6).)

---

[4] Although the standard of review does not call for a review of the entire record, considering the gravity of the case and out of an abundance of caution, we have reviewed the entire record in this case.

[5] All section references are to the California Code of Regulations, title 15, unless otherwise specified.

■ Circumstances tending to show suitability for parole include: (1) lack of a juvenile record; (2) reasonably stable relationships; (3) remorse; (4) significant stress as a cause of the crime; (5) battered woman syndrome; (6) no significant history of violence; (7) a present age making recidivism unlikely; (8) realistic plans for release; and (9) institutional activities showing an ability to function on release. (§ 2281, subd. (d)(1)–(9).)

We review the superior court order granting the petition and the parties' briefs based on the materials before that court. In making its decision the superior court relied solely on documentary evidence; therefore, we independently review the record to determine whether "some evidence" supports the Board's decision. (*Rosenkrantz, supra*, 29 Cal.4th at p. 667.)

*Analysis*

After carefully reviewing the record and applying the factors in the Board's regulations for determining whether a crime indicates unsuitability for parole, and then applying the "particularly egregious" standard (*Rosenkrantz, supra*, at p. 683) to determine whether sole reliance may be placed on the crime's character in denying parole, we find ample evidence, exceeding the "some evidence" standard of review, that the crime was of such a heinous, atrocious, and cruel character that this factor alone justified the Board's determination that Van Houten was unsuitable for parole. The Board relied on other factors as well, but the Board made clear that it relied primarily and heavily on the character of the crime in denying parole. The record demonstrates that reliance was more than justified.

The Board "conclud[ed] that the prisoner is not suitable for parole and that she would pose an unreasonable risk of danger to society or a threat to public safety if released from prison at this time: And the number one and most compelling reason was the commitment offense." The Board then listed its findings as to the five factors supporting its reliance on the offense. (§ 2281, subd. (c)(1)(A)–(E).) "It was carried out in an especially cruel and callous manner. Multiple victims were killed in the same incident. And the motive for the crime was inexplicable or very trivial in relation to the offense. And the victims in this case were mutilated during the offense. . . . At that time during the course of that crime, . . . both victims were repeatedly stabbed to death. The mother, Mrs. La Bianca, was stabbed repeatedly. [¶] . . . And there was an intent on the part of the inmate and her crime partners to make this look like . . . a racial killing and that was done by writing comments on the walls to make it look as if blacks had committed this crime in order to perpetuate the helter skelter as it was described by Charles Manson, who was the leader of this group."

We will review each of the five factors considered by the Board in determining that the character of the offense was a circumstance tending to show unsuitability for parole in the order the factors are listed in the regulation. (§ 2281, subd. (c)(1)(A)–(E).) Then we will consider whether Van Houten's offense involves "particularly egregious acts beyond the minimum necessary to sustain" the conviction such that the Board could rely solely on this circumstance to deny parole. (*Rosenkrantz, supra*, 29 Cal.4th at p. 683.)

The Board found multiple victims were involved. (§ 2281, subd. (c)(1)(A).) Van Houten played a role in the murder of Mr. La Bianca, as well as in the murder of Mrs. La Bianca. Without Van Houten's restraining Mrs. La Bianca, Mrs. La Bianca would undoubtedly have attempted to save her husband by physically intervening or trying to escape to call police. We know this is true because when Mrs. La Bianca heard the sounds of the struggle in the living room, she temporarily overcame Van Houten and Krenwinkel, yelling out her husband's name. Watson was assisted in his stabbing of Mr. La Bianca by his two codefendants taking care of the other victim. Van Houten has acknowledged her responsibility for both murders: "I feel that no matter what my particular participation is or was in the murders, it doesn't diminish or make me feel less responsible. I feel very responsible for Mr. and Mrs. La Bianca's murder. And I feel that it used to be important to me to hope that she was dead and to believe that my feeling that she was when I stabbed her, it made it easier for me to live with. But as I've aged and as I've really come to terms with the loss, it doesn't matter whether I wielded the fatal blows or not, I feel responsible for both their deaths. . . ." Some evidence supports the Board's use of the multiple-victim factor.

The Board found that the murders were "carried out in a dispassionate and calculated manner." (§ 2281, subd. (c)(1)(B).) The Board mentions how Manson, Watson, Krenwinkel, and Van Houten had gone to the La Bianca residence with the specific intent to murder whomever they found there, and how Manson went in first and tied the victims up. (*People v. Manson, supra*, 61 Cal.App.3d at p. 133.) In addition to what the Board mentioned, Manson told the three that he had told the La Biancas that they would only be robbed, and that they should not let the victims know they would be killed to avoid the "messy" character of the Tate murders. (See *id.* at pp. 132–133.) The perpetrators had discussed how they would create the impression of a race war, and proceeded to carry out their intent in gruesome and gory detail. (*Id.* at p. 227.) Van Houten knew what had happened in the Tate murders, and wanted to be involved the next time. At Manson's suggestion, Van Houten brought a change of clothes in case the clothes she was wearing got bloody. Van Houten reported about her stabbing of Mrs. La Bianca "that the more she did it the more fun it was." (*People v. Manson, supra*, 61 Cal.App.3d at p. 227.) After the murders, she wiped fingerprints, changed into shorts and a top out of Mrs. La Bianca's closet, drank chocolate milk, hitchhiked back to

Spahn Ranch, and at the ranch burned clothes and counted money. These activities show a cool, dispassionate, remorseless, and calculating attitude toward these cruel slaughters. "Some evidence" supports the Board's use of the "dispassionate and calculated" factor in finding these murders particularly heinous, atrocious, and cruel.

The Board also found the victims were mutilated (§ 2281, subd. (c)(1)(C)), which they were both before and after their deaths. The multiple stab wounds to Mrs. La Bianca's lower back and buttocks made by Van Houten constituted at least a gratuitous mutilation, as did the fork in Mr. La Bianca's stomach and the knife through his throat.

The Board found the crime "cruel and callous." This finding relates to the factor, "an exceptionally callous disregard for human suffering." (§ 2281, subd. (c)(1)(D).) Although any stabbing shows callous disregard for life, in this case the callousness to suffering was exceptional in several respects. The murderers inflicted an excessive number of stab wounds. (*People v. Manson, supra,* 61 Cal.App.3d at p. 125.) Mrs. La Bianca was first bound with a lamp cord and a pillow case forced over her head. When she managed to throw off her assailants, Van Houten wrestled her back onto the bed and held her while the knife was bent against her collarbone with the force of the thrust. Then Watson came and stabbed her with a bayonet. Mr. La Bianca's death was also peculiarly cruel, stabbed with a knife through his throat and a carving fork plunged in his stomach, "the two tines inserted down to the place where they divide." (*Ibid.*) A particularly poignant cruelty was inflicted on Mrs. La Bianca, who struggled for her life while hearing her husband meet his gruesome fate. These acts of cruelty far exceeded the minimum necessary to stab a victim to death. "Some evidence" supports reliance on the factor of callousness toward human suffering.

The Board found the motive for the murders inexplicable (§ 2281, subd. (c)(1)(E)), mentioning the motive of starting a race war by making the murders look as if African-Americans had committed them. This motive indeed defies rational explanation in its craziness and twisted hatred.

The evidence supporting these five factors provides more than the modicum necessary to support the finding of a heinous, atrocious, and cruel offense such that it is a circumstance tending to show unsuitability. (§ 2281, subd. (c).) Van Houten's defense at trial, reflected in psychological reports submitted in the parole hearing process, was that she was brainwashed by Manson and presents no danger now. However, we need not consider "whether the weight of the evidence conflicts" with the Board's assessment. (*Rosenkrantz, supra,* 29 Cal.4th at p. 679.)

Having determined that the character of the offense was at least a circumstance tending to show unsuitability for parole, we now consider whether the character of Van Houten's offense by itself justifies a denial of parole. It does if the offense involves "particularly egregious acts beyond the minimum necessary to sustain" the conviction. (*Rosenkrantz, supra*, 29 Cal.4th at p. 683.) For the purpose of this question, Van Houten's offense is the equivalent of first degree murder punished currently by a sentence of 25 years to life with the possibility of parole. This offense is characterized by a lack of special circumstances justifying the death sentence or life without the possibility of parole. (Pen. Code, §§ 190, subd. (a), 190.2, subd. (a).) Therefore, if Van Houten's offense is characterized by the presence of special circumstances justifying punishment by death or life without the possibility of parole, then these special circumstances are "particularly egregious acts beyond the minimum necessary to sustain" the conviction. (*Rosenkrantz, supra*, 29 Cal.4th at p. 683.) Some evidence supports the existence of several special circumstances in Van Houten's offense.

The first special circumstance is multiple murder convictions (at least one being of the first degree) in the same proceeding. (Pen. Code, § 190.2, subd. (a)(3).) We have two first degree murder convictions here, and Van Houten would have been subject to a possible death sentence or life without the possibility of parole for the La Bianca murders under the current sentencing law for murder.

The second special circumstance applicable is felony murder. (Pen. Code, § 190.2, subd. (a)(17)(A).) In Van Houten's third trial the court gave felony-murder instructions. There is some evidence that Van Houten aided and abetted the robbery of the wallet and the eight dollars and change from Mrs. La Bianca's box, which she personally counted.

The third special circumstance applicable is the racial motivation for the La Bianca murders. (Pen. Code, § 190.2, subd. (a)(16).) This special circumstance has less force in this case because the murderers and the victims were of the same race. Nevertheless, the purpose of the murders was to instigate a race war in which Whites and Blacks would murder each other. (See fn. 1, *ante.*) The La Biancas were murdered because they were White; in the Family's twisted scenario murdering someone of a different race would not have achieved their purpose.[6]

We conclude that there is some evidence that Van Houten's offense involved multiple murders, the commission of robbery during the murders,

---

[6] A fourth special circumstance applicable is the "especially heinous" character of the murders. (Pen. Code, § 190.2, subd. (a)(14).) However, this special circumstance was held unconstitutionally vague. (*People v. Superior Court (Engert)* (1982) 31 Cal.3d 797, 801–803 [183 Cal.Rptr. 800, 647 P.2d 76]).

and racial hatred. Given the character of these aspects of Van Houten's offense as special circumstances under current law justifying a higher degree of punishment, we find the record contains "some evidence" that Van Houten's offense involved "particularly egregious acts beyond the minimum necessary to sustain" the conviction. (*Rosenkrantz, supra,* 29 Cal.4th at p. 683.) Therefore, the Board would have been justified in relying solely on the character of the offense in denying parole, and the Board was justified in relying primarily and heavily on the character of the offense in denying parole.[7]

The Board considered other factors in denying parole, and we address them in the order mentioned by the Board.

Apparently referring to the "previous record of violence" factor, the Board mentioned a number of arrests during the time Van Houten was with the Manson group. However, the Board did not appear to consider this a significant negative factor since none of the arrests were because of alleged violent acts involving serious injury, or attempted serious injury, to a victim. The arrests were not "some evidence" of a violent record (§ 2281, subd. (c)(2)), but could be considered supportive of the next factor the Board discussed.

The Board next mentioned Van Houten's "unstable social history." The Board mentions her high school pregnancy, heavy drug use, and joining the Manson group. These facts, along with the arrests mentioned in the preceding paragraph, are "some evidence" of "a history of unstable or tumultuous relationships with others." (§ 2281, subd. (c)(3).)

Relating to psychological factors (§ 2281, subd. (c)(5)), the Board notes the favorable psychiatric report, so it is not "some evidence" of current psychological problems. The Board does not appear to have relied on this factor in denying parole.

Moving on to the consideration of positive factors indicating suitability for parole, the Board did not consider motivation for the crime a positive factor in the sense that the crime was "the result of significant stress . . . ." (§ 2281, subd. (d)(4).) Van Houten presented and the Board considered the opinion of

---

[7] The Second District recently affirmed a trial court grant of habeas corpus relief from a Governor's parole denial because, among other grounds, of the lack of any evidence that a second degree murder was committed " 'in an especially heinous, atrocious, or cruel manner . . . .' [Citation.]" (*In re Smith* (2003) 109 Cal.App.4th 489, 506 [134 Cal.Rptr.2d 781].) The case is easily distinguished—the prisoner saw the killer chase the victim into a ravine and heard shots but did not instigate, observe, or participate in the actual murder. (*Id.* at pp. 492–494.)

a leading expert on cults that Van Houten's belief in "helter-skelter" caused "enormous" stress contributing to her decision to participate in the La Bianca murders. The Board explored and Van Houten ultimately rejected the defense theory that her will had been overborne by Manson's influence. The Board impliedly rejected the cult expert's theory, finding that the motivation for the crime was the instigation of a race war and, therefore, "inexplicable or very trivial . . . ." (§ 2281, subd. (c)(1)(E).) The Board mentions "parole plans" (§ 2281, subd. (d)(8)) and the letters offering employment and a place to live. These letters show that Van Houten's release plans were realistic, and so her parole plans must be considered a positive factor.

The Board considered Van Houten's "institutional activities showing an ability to function on release." (§ 2281, subd. (d)(9).) Supporting release on parole, the Board commends Van Houten for "extremely positive programming." This included: (1) literacy tutoring; (2) a women's advisory council; (3) religious services; (4) chairing, facilitating, and actively participating in alcohol and drug recovery programs; and (5) good reports on her job performance as a clerk. However, supporting a denial of parole, the Board found, "We also note that the prisoner has not completed the necessary programming[8] which is essential to her adjustment and needs additional time to gain such programming and gain further insight into her involvement in this crime. And the recommendations of the Panel are that the inmate remain disciplin[e]-free, if available participate in self-help and therapy programming, and cooperate with any clinicians in the completions of any clinical evaluations that may be done."

This finding and recommendation appear to be based in part on testimony received during the parole hearing that Van Houten for a little less than a year had not been able to participate in self-help groups and other programs because of her clerical job shift, which was changing so as to permit her to resume her programs. However, in referring to Van Houten's need for "further insight into her involvement in this crime," the Board implies that Van Houten still has not demonstrated an understanding of her responsibility for the heinous character of the crime that she perpetrated in concert with her codefendants.

This conclusion may have been based on Van Houten's intermittent minimization of her role in the murders. When asked during the parole hearing by Commissioner Ortega how she was feeling about the murders, Van Houten said, "I feel that no matter what my particular participation is or was in the murders . . . ." Although she goes on to accept full responsibility for the

---

[8] The Board uses the term "programming" to refer to the various therapeutic, self-help, service, educational, and religious programs, all considered to have rehabilitative effects, available at the California Institution for Women.

crimes, this statement implies, and is "some evidence," that she still dwells on what she considers to be her lesser comparative degree of participation. This implication is reinforced by her response to Commissioner Ortega's question as to whether "any one of you [was] more culpable for this crime [—] anyone more responsible than the other?" Van Houten initially responds holding Manson more responsible, thereby deflecting responsibility for her actions on Manson. Apparently recognizing her error in failing to accept full responsibility, she subsequently reframes Commissioner Ortega's question incorrectly as relating to "the designing of the crime" and accepts full and equal responsibility. However, Van Houten's initial response indicates an ambivalence about her acceptance of responsibility for her part in the murders, providing some evidence that she needs "further insight." Given the lack of insight into her participation in such a horrendous crime, as well as her recent nonparticipation in self-help programs, the Board was justified under the "some evidence" standard in considering her need for further counseling a factor supporting parole denial.[9]

Furthermore, these findings are justified by the evidence of the egregious character of the offenses and Van Houten's social history. The egregious character of the offenses and her social history are "some evidence" that Van

---

[9] Van Houten criticizes this argument on several grounds in an otherwise helpful petition for rehearing.

First, Van Houten contends that we are using her "minimizing responsibility" as a new unsuitability factor not among those listed in the statutes or regulations. (Pen. Code, § 3041, subds. (a), (b); Regs., § 2281, subds. (c), (d).) On the contrary, Van Houten's minimization of her responsibility supports the Board's determination that she is in need of further programming, meaning "institutional activities indicat[ing] an enhanced ability to function within the law upon release." (§ 2281, subd. (d)(9).)

Second, Van Houten contends that using her minimization of her responsibility violates the rule against requiring an admission of guilt in a parole hearing. (Pen. Code, § 5011, subd. (b).) She argues, "A logical and reasonable reading of the statute is that it also forbids the Board from finding . . . Van Houten unsuitable because she refuses to admit to the prosecutor's version of the facts or to the Board's speculations and conjecture about what happened 35 years ago preceding and during the murders." Without commenting on this extension of the statute, we simply observe that Van Houten in her testimony did not contest the Board's version of events, nor was the Board punishing Van Houten for not admitting a version of the facts different from her testimony. Van Houten and the Board were in agreement about what occurred, and the Board was exploring Van Houten's attitude about what she admittedly did. Determining what her attitude is toward her crimes is critical for deciding whether further counseling was needed to "enhance[] [her] ability to function within the law upon release." (§ 2281, subd. (d)(9).)

Finally, Van Houten contends that our construction of her testimony against her was unfair given her right to clarify to the Board the involvement and motivations of the participants in the murders. However, our function as a reviewing court is to review the record to see whether "some evidence" exists on which reasonable inferences can be made supporting the Board's findings and decision. (See *Rosenkrantz, supra,* 29 Cal.4th at pp. 658, 665, 677, 679.) The inferences we draw in the text from Van Houten's testimony are reasonable and support the Board's finding that Van Houten needed further counseling and should not be released at that time. (See § 2281, subd. (d)(9).)

Houten is an unstable person who supported and committed some of the most vicious and evilly motivated murders ever perpetrated. The Board could reasonably conclude that Van Houten's defense that Manson's influence overwhelmed Van Houten was exaggerated such that she is fully responsible for the La Bianca murders. Indeed and to her credit, she finally accepts responsibility for the murders of both Mr. and Mrs. La Bianca.

Although Van Houten may not have exhibited any behavior in the past 30 years of institutionalized living from which one could infer that she would commit such crimes again, and although psychological evaluations find no evidence of a tendency to commit the horrendous crimes she committed, the nature of the crimes still provides a basis for concluding that Van Houten is a public danger in need of further therapy. Her murders were not as if she had murdered people whom she knew and had given her a once-in-a-lifetime motive to kill as in *Rosenkrantz*—she just went along with the other Family members to murder whomever they haphazardly picked to sacrifice to their evil apocalyptic fantasies. No one can convincingly say with certainty that, having done that once, she will never do it again. Her deeds are "some evidence" that the horrible potential may still be within her.

The Board could infer with sufficient reasonableness to satisfy the minimal "some evidence" standard that Van Houten is a danger to the public and in need of continued therapy and programming.

Thus, the Board found as to Van Houten's institutional behavior that her program participation had generally been a positive factor, but her recent lack of participation was a negative factor. "Some evidence" exists in the record to support both findings.

Summarizing the factors expressly found by the Board, all of which were supported by "some evidence," the negative factors included the heinous and cruel character of the crime, Van Houten's unstable social history, and her recent lack of involvement in various programs. (§ 2281, subd. (c)(1), (3), subd. (d)(9).) The positive factors consisted of very good institutional behavior, favorable psychological evaluations, and realistic parole plans (§ 2281, subds. (c)(5), (d)(8), (9).) A factor considered as it applied to Van Houten, but which did not appear to weigh heavily in the Board's decision either positively or negatively, was some nonviolent criminal activity while with the Manson family (see § 2281, subds. (c)(2), (d)(1), (6)), except as it may have been evidence of an unstable social history (§ 2281, subd. (c)(3)).

We also note the omission in the presentation of the decision of any finding or comment about remorse or age. (§ 2281, subd. (d)(3), (7).) This lack of an express finding or discussion about these factors does not necessarily mean

that they were not considered. (See *In re Ramirez* (2001) 94 Cal.App.4th 549, 572 [114 Cal.Rptr.2d 381] (*Ramirez*) [every factor considered need not be stated, especially if found unpersuasive, but failure to acknowledge significant factor may indicate an unreasonable decision].)[10]

In this case these factors were not particularly persuasive or important compared to Van Houten's other positive factors (good institutional behavior, psychological reports, and parole plans) and the negative factors (the heinousness of the crime, need for further counseling, and unstable social history). They were brought out, discussed, and considered during the hearing in proportion to their lesser importance in this case. The Board expressly asked Van Houten about her remorse, which she expressed. Respecting age, Van Houten's counsel argued that those "who have known her for 30 or 40 years . . . see today in this nearly 51-year-old woman the girl they knew before Manson and drugs." During the hearing the Board noted that her age was 18 or 19 at the time of the murders and that almost 31 years had passed as of the time of the hearing in June 2000. We conclude that Van Houten's remorse and age were adequately discussed and considered, even though not mentioned in the decision, given their lesser importance in this case.

---

[10] Two lines of appellate court decisions have differed in the inferences they draw from the omission of factors in the discussion of parole unsuitability. In *Ramirez, supra*, 94 Cal.App.4th 549, Division Three of the First District held that the Board's "failure to acknowledge that Ramirez's conduct in prison was a circumstance that supported his application" was an "indication of an arbitrary and capricious determination." (*Id.* at p. 572.) The court made this finding despite the Board having commended Ramirez for his conduct in prison because this "failed to reflect consideration . . . *as a circumstance tending to show his suitability for parole.*" (*Id.* at p. 571, original italics.) Along the same lines, in *In re Capistran* (2003) 107 Cal.App.4th 1299 [132 Cal.Rptr.2d 872], Division Six of the Second District affirmed the trial court's granting of a petition for writ of habeas corpus because the Governor's decision did not acknowledge the prisoner's institutional behavior "or other facts" supporting a grant of parole, including remorse. (*Id.* at p. 1306.) The court held that this acknowledgment was required to fulfill the due process requirement set forth in *Rosenkrantz* that "the Governor's decision . . . 'reflect an individualized consideration of the specified criteria' . . . ." (*In re Capistran, supra*, 107 Cal.App.4th at p. 1305.)

In a contrary line of cases, in *In re Morrall* (2002) 102 Cal.App.4th 280, 299–300 [125 Cal.Rptr.2d 391], the Third District held that Penal Code section 3041.2, subdivision (b) required the Governor to give the prisoner "a written statement specifying the reasons for the decision" and did *not* require the Governor "to discuss in detail every factor that was considered by the Board." In *In re McClendon* (2003) 113 Cal.App.4th 315, 323 [6 Cal.Rptr.3d 278], Division Four of the First District decided that "nothing in the California Constitution or statutes specifies that the Governor must provide a detailed written analysis of each parole suitability factor. (Cal. Const., art. V, § 8, subd. (b); Pen. Code, § 3041.2, subd. (b).)" In so holding, the court found *Morrall* more persuasive than *Capistran*. (*In re McClendon, supra*, 113 Cal.App.4th at p. 323.)

These cases are not of particular importance in Van Houten's case because in these cases the Board or the Governor either omitted any discussion of factors supporting parole or omitted discussion of a relatively important factor in the decision. In Van Houten's case the Board thoroughly discussed in its decision all of the relatively important circumstances concerning both suitability and unsuitability for parole.

Weighing the positive and negative factors, the Board found, "However, these positive aspects of [Van Houten's] behavior do not outweigh the factors of unsuitability." Explaining why the factors indicating suitability did not outweigh the factors indicating unsuitability, the Board again went over the "especially cruel manner" in which Van Houten participated in the murders. Thus, the Board made clear that the character of the crime dominated its consideration of Van Houten's parole release. Stating its determination that the unsuitability factors outweighed the suitability factors completed the Board's obligation to articulate its decision, which, we conclude, was supported by "some evidence" and should not have been overturned by the superior court.

### The Superior Court's Excessively Strict Review

After this application of the law to the facts of the case, the superior court's decision comes into focus. The superior court's chief objection to the Board's decision was that the Board "did not give any basis in fact or evidence to support" its finding that the factors indicating unsuitability outweighed the factors indicating suitability for parole. "There is no reason given or stated by the Board of any evidence in the record from which it can be determined factually why the [Board] found that the gravity of the crime outweighed the other factors to be considered, which, without exception, were all favorable toward finding suitability for parole. This lack of factual findings or reasons in the record demonstrates that the Board, while mentioning the factors of suitability, arbitrarily ignored them in any meaningful consideration and evaluation manner, and their review was in fact a 'pro forma' consideration."

The short answer to this objection is that the superior court engaged in a stricter standard of review than is permitted for a court reviewing a decision by the Board and that the Board is not required to state why the character of the crime outweighed the other factors. All that the Board is required to do is decide which factors are applicable to Van Houten based on the evidence presented, and then make a reasonable decision as to which factors should weigh more heavily in determining suitability. A more complete explanation requires a comparison of this case with the Supreme Court's opinion in *Rosenkrantz*.

The petitioner in *Rosenkrantz* was convicted of second degree murder and sentenced in 1986 to 15 years to life, plus two years for a firearm personal use enhancement. (*Rosenkrantz, supra,* 29 Cal.4th at p. 627.) The male 18-year-old petitioner shot the male 17-year-old victim 10 times with a burst from an Uzi when the victim refused to recant accusations that the petitioner was homosexual. (*Id.* at p. 629.) Then the petitioner called a deputy sheriff who was a former teacher and confessed, but traveled for a month in northern

California and Oregon visiting friends before surrendering. (*Ibid.*) The Board denied parole several times, but both a superior court and an appellate court agreed that there was no evidence to support the Board's finding of unsuitability on the ground that the crime exhibited "an exceptionally callous disregard for human suffering." (*Id.* at pp. 631–633.) While the appellant's petition for review of the Court of Appeal's decision was pending, in 2000 the Board found the petitioner suitable for parole as in effect directed by the Court of Appeal, and the Governor reversed the finding. (*Id.* at pp. 633–634.) The Supreme Court granted the appellant's petition for review, the petitioner filed his petition for writ of habeas corpus, and the Supreme Court in *Rosenkrantz* denied the petition and reversed the Court of Appeal. (*Id.* at pp. 625, 686.) Thus, our case is in a similar posture insofar as the superior court here also disagreed with the Board's use of the heinousness of the crime to overrule a good institutional record and other positive factors.

In denying parole in *Rosenkrantz,* the Governor merely stated in a heading that the petitioner's " 'institutional behavior does not outweigh the circumstances of the crime in assessing his suitability for parole.' " (*Rosenkrantz, supra,* at p. 682.) This heading was followed by a single sentence: " 'Although [petitioner] has been discipline free and continued his education while in prison, the State of California expects this of all prisoners.' " (*Ibid.*) Noting that good conduct and program participation should be considered by the Governor on an individual basis, the Supreme Court held that the record showed that the Governor did provide such consideration based on the statement in the decision "that the gravity of the offense and other circumstances 'outweigh the arguments advanced for release, such as . . . his prison record or his parole prospects.' " (*Ibid.*) In the next sentence, the Supreme Court upheld the Governor's decision saying, "Therefore, the Governor did not disregard petitioner's [good] behavior in prison solely because the state expects all prisoners to behave well, but rather considered it as a factor—although one outweighed by the gravity of the offense." (*Ibid.*)

Continuing in *Rosenkrantz* a paragraph later, the Supreme Court went on to explain that "[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." (*Rosenkrantz, supra,* 29 Cal.4th at p. 682.) The decision cannot be based on "a blanket rule that automatically excludes parole for individuals . . . convicted of a particular type of offense, [but] the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant." (*Id.* at p. 683.) "The Governor's decision in the present case adopted such an approach and relied, in addition, upon petitioner's conduct—affirming his violent act—while he remained a fugitive during the several weeks following commission of the crime. Nothing in the Governor's decision indicates that he failed to afford petitioner individualized consideration of all relevant factors . . . ." (*Ibid.*)

In the next paragraph of the *Rosenkrantz* opinion, the Supreme Court acknowledges that "[i]n some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation . . . ." (*Rosenkrantz, supra,* 29 Cal.4th at p. 683.) The Supreme Court gives an example of such a violation in the same sentence: "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (*Ibid.*) The rule this example violates is given at the end of the paragraph in holding the Governor's denial of parole justified: "As we have seen, however, the Governor has emphasized certain circumstances of petitioner's offense, as well as his postoffense conduct, that involve *particularly egregious acts beyond the minimum necessary to sustain a conviction* for second degree murder. Accordingly, the Governor properly could consider the nature of the offense in denying parole. [¶] Therefore, we conclude that the Governor's decision finding petitioner unsuitable for parole is supported by some evidence." (*Ibid.*)

We observe that the Supreme Court did not require any reasoning on the record as to why the particularly egregious character of the offense outweighed the factors favoring parole. In support of this observation, we emphasize in particular that at every point the Supreme Court found adequate the Governor's heading and single-sentence statement about its determination that the factors supporting a denial of parole outweighed the factors supporting a grant of parole. The heading and single sentence "did not disregard petitioner's [good] behavior in prison" (*Rosenkrantz, supra,* 29 Cal.4th at p. 682) and had not "failed to afford petitioner individualized consideration of all relevant factors . . . ." (*Id.* at p. 683.) Thus, the superior court did not have the authority to require a statement of reasons or evidence as to why the Board found the negative factors outweighed the positive factors.

■ We conclude from our review of *Rosenkrantz* that where the Board's evaluation of the crime as "particularly egregious" is supported by "some evidence," the Supreme Court does not contemplate a reversal of the Board on the ground that, as in Van Houten's case, the superior court thinks the Board failed to state on the record the reasons for its decision that the nature of the crime outweighed factors supporting parole. As we discussed above, the record contains "some evidence" supporting the Board's determination that Van Houten's crime was "particularly egregious beyond the minimum necessary to sustain a conviction" for first degree murder carrying with it a life sentence with the possibility of parole. Therefore, the superior court erred in granting Van Houten's petition for habeas corpus.

*Van Houten's Contentions*

Van Houten disguises her disagreement with the Board's findings as a contention that the Board disregarded the positive suitability factors. This "disregard" was purportedly shown by there being "barely a mention" or "hardly a reference" or "only a passing reference" or "no mention" about such factors as "the stress petitioner was experiencing relative to her motivation for the crime," her 32-year postconviction record, her lack of disciplinary reports for the past 25 years, psychiatrist findings that she would not be a danger if released, successful completion of "all the therapy and AA and NA programs that the prison has to offer." Van Houten concludes the argument, "Passing discussion of this evidence and commendation for her prison record as a whole does not constitute due consideration of these elements as suitability factors." Our review of the record, however, shows that the Board did consider all of these factors in its decision.

Contrary to the contention that "no mention of the cult domination bearing on motivation as a suitability factor" is made, the Board specifically asked Van Houten, "Yet you were—what you're saying is Mr. Manson had such control over you that . . . you're saying . . . he was more responsible for this crime than you were." Van Houten responded, "I certainly believe that whatever he became was equally my responsibility for allowing him to become that. You know, people can pull reins in on other people and I never did that. . . ." This testimony is "some evidence" that Van Houten was not overborne by cult domination. Thus, the Board did consider the effect of cult domination on Van Houten's motivation, but rejected it as a factor indicating suitability for parole in this case.

Disproving the assertion that Van Houten's positive psychiatric reports and achievements in prison were mentioned only in passing, the Board said, "We do note that the psychiatric report is favorable in terms of what was written for this hearing, as well as she does have parole plans. And we did have the opportunity, Counsel, to review those letters. We did see the letters of support for jobs as well as place to live . . . ." Further on the Board says, "Nevertheless, the prisoner should be commended for her extremely positive programming. She has been in charge—or been part of the Yes, I Can Too program. That's a tutoring program for inmates trying to gain more education. She has been a member of the WAC Council, W-A-C. That's the Women's Advisory Council. Also participating in the Native American religious services. She was the chairperson of AA and NA . . . ." The Board also noted, "She has been a facilitator for the NA 12-step program as well, and has been very active in the Al-Anon and 12-step programs." This statement shows the Board did its homework and knew and considered the positive suitability factors.

Van Houten cannot legitimately criticize the Board for not considering the applicable factors, because that consideration is in the record of the Board's hearing and statement of decision. Van Houten's real argument is that the Board must have disregarded the positive suitability factors because it denied parole. But, of course, that fallacious reasoning ignores the possibility that the Board did fully consider the positive suitability factors, but decided they were outweighed by the horrific character of the crime, which is just what the Board said it did: "However, these positive aspects of her behavior do not outweigh the factors of unsuitability." As we have previously explained, that determination in this case was a reasonable exercise of discretion supported by "some evidence."

Van Houten contends that "[t]he role of the courts is not limited to determining whether basic procedural due process was satisfied because California's parole statutes create a constitutionally protected liberty interest, an expectation that parole shall be granted, based upon *Penal Code* § 3041 which states the parole Board 'shall normally' set a release date." This is incorrect, and the portions of *Rosenkrantz* that Van Houten cites (*Rosenkrantz, supra,* 29 Cal.4th at pp. 654, 664) do not sustain this distortion. Rather, the cited pages support the proposition that Van Houten does have a liberty interest protected by due process of law, and that protection requires judicial review, but only a judicial review that does not violate the separation of powers by usurping executive branch authority to execute her sentence. The Supreme Court in *Rosenkrantz* is very clear that the standard of judicial review that satisfies both the requirements of due process and deference to executive discretion is "the 'some evidence' standard." (*Id.* at pp. 658, 664–665.) Thus, contrary to Van Houten's contention and correcting her above quoted language, "The role of the court *is* limited to determining whether basic procedural due process was satisfied . . . ."

Van Houten contends that "The Supreme Court in *Rosenkrantz* . . . not only looked at whether there was 'some evidence' to support the decision as a whole, but looked with specificity to see whether there was some evidence to support the particular findings on which the Governor based his ultimate decision." This statement heightens the standard of review by contrasting " 'some evidence' to support the decision as a whole" with "some evidence to support the particular findings." The effect is to imply that *Rosenkrantz* requires each finding the Governor or Board relied upon to be supported by "some evidence" for the parole denial to be supported by "some evidence." This is not the standard of review applied in *Rosenkrantz*.

While Van Houten is correct in noting that the Supreme Court looked into the record to determine whether "some evidence" supported particular findings, and even found one finding not to be supported by any evidence, the

Supreme Court upheld the parole denial "[b]ecause those portions of the decision that are supported by some evidence constitute a sufficient basis supporting the Governor's discretionary decision to deny parole . . . ." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.) Thus, each finding relied upon by the Governor or the Board need not be supported by "some evidence"—it is enough that the findings supported by "some evidence" suffice to support the parole denial.

Van Houten argues, "After 34 years, the circumstances of the commitment offense provide no evidence of current dangerousness where there is no evidence of a current psychological or behavioral tendency to fall under another individual's influence to commit violence or break the rules of the community in which she lives." Van Houten also notes that the highest category in the matrix used by the Board to compare first degree murders indicates 22 years as the base term before postconviction credits, with which Van Houten would be considered to have served 44 to 46 years. (See §§ 2281, subds. (a), (b), 2284–2286, 2290.) This argument is not persuasive in this case.

This argument was made successfully in *Ramirez, supra*, 94 Cal.App.4th at pages 570–571: In that case the appellate court characterized as arbitrary a parole denial because it was based on the gravity of the offense for the seventh time, nine years after initial eligibility and 17 years after the petitioner began his 15-year-to-life prison term. The court recognized, but found to be inadequate justification for the parole denial, that "some evidence" supported the Board's finding on the gravity of the second degree murder based on the accidental death of an accomplice during a pursuit after a dual robbery.

However, *Ramirez* is distinguishable because, although the accidental death of an accomplice does *not* represent a particularly egregious example of second degree murder, the crimes perpetrated by Van Houten in this case *are* a particularly egregious example of murder punishable by a life sentence *with* possibility of parole. Indeed, as shown above, the special circumstances are present in this case that would normally support a sentence of life *without* the possibility of parole. Thus, although in this case the June 2000 parole denial under consideration here was Van Houten's twelfth in about 22 years since she first became eligible in 1978, and she has now served about 34 years in prison, given the horrible character of her offense the parole denial does not violate the proportionality of the murder sentencing scheme and is neither arbitrary nor capricious. (See *Ramirez, supra*, 94 Cal.App.4th at p. 570.)[11]

---

[11] A related argument is the subject of a recent grant of review by the Supreme Court. (*In re Dannenberg* (2002) 102 Cal.App.4th 95 [125 Cal.Rptr.2d 458], review granted Jan. 15, 2003, S111029 ["At a parole suitability hearing that is held pursuant to Penal Code section 3041,

In discussing this contention at oral argument, a recent Ninth Circuit Court of Appeals case was considered. In *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, the reviewing court affirmed the trial court's finding that "some evidence" supported the Board's denial of parole even though the trial court found that seven of the Board's 10 findings were without factual support, and the appellate court concurred on at least four of the seven. (*Id.* at pp. 913, 915–916.) This reinforces the point made previously (see p. 356, *ante*) that there need not be some evidence supporting each and every one of the Board's findings on which it relied to deny parole.

However, Van Houten emphasizes the concluding dictum in *Biggs* that "A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, . . . could result in a due process violation." (*Biggs v. Terhune, supra,* 334 F.3d at p. 917.) Though stated as a general principle, we take the admonition in the context of the facts of the *Biggs* case. Those facts were that a California superior court in 1985 sentenced Biggs to 25 years to life. The sentence punished a conviction for a first degree murder accomplished by Biggs and his coconspirators by deceiving the victim, a witness against one of the conspirators, into thinking he was being taken out of state and then bludgeoning him to death. (*Id.* at p. 916.) Biggs did not perform the bludgeoning, but was involved in the conspiracy from the inception. (*Ibid.*) And he was present during the murder, paid the coconspirators, and returned with the actual murderer to further conceal the body. (*Ibid.*) Biggs was a model inmate, but the Board found him unsuitable for parole in 1999. Thus, we take the dictum as relating to a crime of this sort, and not applicable to Van Houten's crime in which she was a hands-on participant in a double murder and mutilation to incite a race war. Although the dictum makes sense in the context of the case in which it was uttered, the dictum's force is diminished in this case because of the more hideous character of the crime.

Van Houten argues that the actions of her codefendants cannot be imputed to her for the purpose of determining her suitabilit for parole. She argues that to do so conflicts with the requirement of an "individualized consideration of the specified criteria . . . ." (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) Van Houten compares her case to *Ramirez,* in which one of the accomplices punched the convenience store clerk and in which the petitioner displayed and pointed an unloaded shotgun while his two accomplices robbed the clerk and an elderly man. (*Ramirez, supra,* 94 Cal.App.4th at p. 553.) The

must the Board of Prison Terms generally engage in a comparative proportionality analysis with respect to offenses of similar gravity and magnitude and consider base term matrices used by the Board in setting release dates and deny a parole date solely on the basis of the circumstances of the offense only when the offense is particularly egregious, or may the Board first determine whether the inmate is suitable for parole because he or she is no longer a threat to public safety and engage in a proportionality analysis only if it finds the inmate suitable for parole?"].)

felony murder occurred as Ramirez fled, driving a car at high speed, with his accomplices; he failed to make a sharp turn and crashed, killing one of his passengers. (*Ibid.*) Respecting the robbery itself, the appellate court noted that "Ramirez never fired the weapon, which was unloaded, nor [did he] harm the robbery victim. He took no active part in the assault on the store clerk perpetrated by [an accomplice]." (*Id.* at p. 570.)

But there is no comparison between the cases. Ramirez may not have intended, known, or even suspected that his partner in crime would assault the store clerk, and so arguably could not be held responsible for the gratuitous violence. But the record contains ample evidence that Van Houten intended that Mr. and Mrs. La Bianca be stabbed and mutilated to instigate a race war. Manson asked her if she believed in what he was doing, and she did. She watched news accounts of the Tate murders and had Krenwinkel and Atkins fill in the details for her about the vicious, bloody acts. She was not horrified or repulsed, but felt left out and wanted to be a part of the next set of murders. She brought extra clothing with her knowing her clothes would be marked with the blood of their victims. Knowing she was about to help kill the innocent wife of the man she knew Watson was about to kill, she took Mrs. La Bianca into her bedroom. She put a pillow case over the terrified woman's head and wrapped a lamp cord around her neck. Van Houten heard Mr. La Bianca as he was being violently stabbed by her coconspirator, and wrestled Mrs. La Bianca when she rose up screaming her tortured husband's name. She kept Mrs. La Bianca out of the way while Watson stabbed and mutilated Mr. La Bianca. She held her struggling, pitiful victim while Krenwinkel drove a kitchen knife into her collarbone with such force that it bent. Van Houten called out to Watson for the precise reason that he would come and assist her in murdering Mrs. La Bianca. Not knowing whether Mrs. La Bianca was dead, she personally stabbed Mrs. La Bianca. She intended that the murders be attributed to African-Americans by avoiding detection, which she sought to achieve by wiping away fingerprints. This she did intently and thoroughly wherever she, Watson, or Krenwinkel went, including the bedroom, bathroom, living room, and kitchen, so much so that investigators found many fingerprints that had been wiped but not one fingerprint from any of them that was identifiable. Van Houten intended to inflame Whites against Blacks by leaving a White woman's body mutilated under circumstances indicating the atrocity had been committed by Blacks. She may not have had the stomach to use her victims' blood to mark on their walls, but she agreed with the group's goals and that her crime partners should accomplish those goals, and actively assisted them with the mutilation and avoiding detection. (*People v. Manson, supra*, 61 Cal.App.3d at pp. 128–130.) Thus, she was responsible for the actions of Watson and Krenwinkel, whom she actively supported and assisted in the grisly murders of which they all stand convicted. That is, after all, the whole point of the conspiracy-to-commit-murder count, which was specific to the La Bianca

murders, in addition to her conviction for two counts of first degree murder. Thus the argument that succeeded in *Ramirez* is simply ludicrous here.

Van Houten argues that she was mentally incapacitated by cult brainwashing such that her individual role, which she asserts was less than that of others, cannot be considered among the most aggravated for first degree murder. To some extent this argument is supported by the prosecution's decision in the third trial to request a felony-murder instruction so that the jury did not have to unanimously decide beyond a reasonable doubt that Van Houten intended and premeditated the murders. However, the Board is not limited by what the jury did or did not decide. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 678–679.) If there is some evidence showing that Van Houten was not brainwashed but freely intended and premeditated the deaths of the La Biancas, then the Board may rely upon that evidence. There was some evidence that Van Houten was in full possession of her faculties and not browbeaten or coerced into the murders, and that she freely and independently intended to commit and premeditated the murders.

Van Houten argues that the Board's finding of a particular fact must be supported by a "reasonable interpretation of [the] circumstances" surrounding the fact. (*Rosenkrantz, supra,* 29 Cal.4th at p. 680.) By this expression the Supreme Court in *Rosenkrantz* did not mean anything more than that the decision had to be supported by some evidence. Only where some evidence did not support the Governor's finding did the Supreme Court hold that the Governor's finding was not a reasonable interpretation of the circumstances. Specifically, the Governor found that the petitioner had lied when he asserted that he had been attacked by the murder victim and petitioner's brother. However, the unquestioned evidence was that the victim and petitioner's brother kicked down the door of petitioner's beach house "shouting 'get the fuck out of here you faggots,' " using a flashlight to break petitioner's nose and a stun gun to burn petitioner's hands. (*Id.* at p. 680.) In this case, Van Houten attempts to apply this holding in *Rosenkrantz* to argue, "The facts of petitioner's crime do not tend 'logically and by reasonable inference' to establish that 'consideration of the public safety requires a more lengthy incarceration for this individual . . .' (§ 3041[, subd.] (b))." As previously explained, the facts of the crime are "some evidence" of, and do reasonably support, the Board's conclusion that public safety does require Van Houten's continued incarceration.

Van Houten argues that the "some evidence" standard "does not mean that any speculative inference based on evidence within an administrative record satisfies the standard." But here we are not dealing with a speculative inference—as previously set forth, some evidence supports the Board's determination that the crime was particularly egregious such that the Board was

justified in relying on it as the sole justification, along with the instability of Van Houten's life before the crime, for denying parole.

Van Houten argues that the Board's denial is an exception to the rule that parole shall normally be granted, and that the Board's exemption in her case has swallowed the rule. Again she cites and quotes from *Ramirez, supra*, 94 Cal.App.4th at pages 569–570: "[T]he circumstances of *any* past offense, even any murder, are not necessarily a sufficient ground for the Board to refuse to set a parole release date. All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. [Citation omitted.] And the Legislature has clearly expressed its intent that when murderers—who are the great majority of inmates serving indeterminate sentences—approach their minimum eligible parole date, the Board 'shall normally set a parole release date.' (Pen. Code, § 3041, subd. (a).)" However, the paragraph from which this quotation comes is followed next by a paragraph beginning, "Therefore, a life term offense . . . must be particularly egregious to justify the denial of a parole date." (*Id.* at p. 570.) Again, here, there is "some evidence" supporting the Board's determination that this offense was "particularly egregious." (*Ibid.*)

The last set of Van Houten's arguments that we will consider is that the Board has been inconsistent in awarding parole dates to other prisoners while denying Van Houten a parole date. Van Houten makes a related argument that the Board has been inconsistent in dealing with Van Houten in that she has been given one-year denials with encouraging comments to the effect that she was close to being paroled. Van Houten also compares grants of parole to prisoners in penal systems other than the State of California. (See, e.g., *McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895.) This set of arguments does not persuade us because of the wide range of reasonable parole decisions that are beyond the authority of the courts of the State of California to reverse given the "some evidence" standard of review. None of the comparisons Van Houten makes necessarily imply that this denial lacked "some evidence" to support it.

### Disposition

We reverse the trial court's order granting the petition as specified, and direct the superior court to enter an order denying the petition.

McKinster, J., and Richli, J., concurred.

A petition for a rehearing was denied March 30, 2004, and the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied June 23, 2004. Brown, J., did not participate therein.